IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 105,297

STATE OF KANSAS,
*Appellee,*

v.

MICHELLE BOLZE-SANN,
*Appellant.*

SYLLABUS BY THE COURT

1.

Failure to comply with the time limitation for filing a motion to dismiss as specified in K.S.A. 22-3208(4) constitutes a waiver of the issues and precludes review on appeal.

2.

To act recklessly, a defendant must know that he or she is putting others in imminent danger but need not foresee the particular injury that results from his or her conduct.

3.

If a defendant exposes an infant to a known risk that injury could result if the infant naps on an adult bed, the risk exists throughout the period the child naps and is imminent.

1

**4.**

Where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means.

**5.**

While the district court has a duty to instruct the jury on the law that applies in a particular case, a district court does not have to provide the jury a definition for widely used words or those readily comprehensible by individuals of common intelligence. In general, jurors are expected to decipher many difficult phrases without receiving specific definitions. A district court should only define additional terms if the instructions as a whole would otherwise mislead the jury or cause it to speculate.

**6.**

Under the facts of this case, the district judge did not err in refusing to instruct the jury that K.A.R. 28-4-116(b)(2)(A) (2009) is not intended to protect infants from suffocation.

**7.**

Under K.S.A. 22-3420 before it was amended in 2014, it was error for a district court to discuss and answer outside the defendant's presence a question received from the jury during its deliberations. The error may be harmless, however.

8.

If a district court discusses or answers a question asked by a jury during its deliberations without the defendant being present, several factors help determine whether any error is harmless: (1) the overall strength of the case against the defendant; (2) whether either party objected to the manner in which the judge handled the communication; (3) whether the judge's communication with the jury concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and also how the communication was conveyed to the jury; and (4) the ability of any posttrial remedy to mitigate the error.

9.

Pressing a point without pertinent authority is akin to failing to brief an issue, which results in a party waiving or abandoning the argument.

10.

Failing to raise a jury polling issue before the district court, either contemporaneously or in a posttrial motion, precludes appellate review.

Review of the judgment of the Court of Appeals in an unpublished opinion filed July 27, 2012. Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed June 19, 2015. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

3

The opinion of the court was delivered by

LUCKERT, J.:  In this tragic case, an infant died from respiratory failure after becoming trapped between the mattress and footboard of an adult bed at his daycare provider's home. The State filed criminal charges, and a jury convicted daycare provider Michelle Bolze-Sann of involuntary manslaughter and aggravated endangering a child. Bolze-Sann appealed and before us raises seven issues. Three of her issues relate to the sufficiency of the evidence relevant to proving whether she acted recklessly, which is an element inherent in both crimes as charged. Two other issues relate to alleged errors in instructing the jury:  One of these issues relates to the meaning of recklessness and the other to the impact of a daycare licensing regulation on Bolze-Sann's guilt or innocence. Her other two issues raise procedural errors in the conduct of the trial, specifically in the manner of answering a question from the jury and of accepting the jury's verdict.

A panel of the Court of Appeals first considered these issues. The panel affirmed Bolze-Sann's convictions, finding some issues had not been preserved, others lacked merit, and one constituted error—*i.e.*, the district court failed to assure that Bolze-Sann was present when the court and counsel prepared a response to a question asked by the jury during deliberations. The panel held that error was harmless. *State v. Bolze-Sann*, No. 105,297, 2012 WL 3135701 (Kan. App. 2012) (unpublished opinion). Bolze-Sann requested this court's review on some, but not all, of the issues the Court of Appeals considered. We granted her petition for review and now affirm Bolze-Sann's convictions.

FACTS AND PROCEDURAL BACKGROUND

Bolze-Sann operated a licensed daycare facility in her home. Zachary Typer, the victim in this case, began attending her facility in February 2007. At the time of Typer's death on July 2, 2007, he was almost 6 months old. That day, Bolze-Sann placed Typer on an adult bed to nap even though her licensed daycare was subject to regulations promulgated by the Kansas Department of Health and Environment, including K.A.R. 28-4-116(b)(2)(A) (2009). At the time of Typer's death, that regulation provided: "Napping facilities . . . shall be provided as follows:  A crib or playpen with slats not more than 2 3/8 inches apart or equipped with bumpers shall be used for each child under 18 months."

Typer's parents testified at trial that they had instructed Bolze-Sann to put Typer in a crib or playpen for his naps and that Bolze-Sann had confirmed she would. Typer's parents also testified that on several occasions they discovered Typer in an adult bed, but Bolze-Sann had always assured them Typer was on the bed for a reason other than napping (such as diaper changing). Typer's mother testified that in June 2007 she specifically reiterated to Bolze-Sann that Typer was to nap in a crib or playpen, and she further testified that she told Bolze-Sann about Typer's rapidly increasing mobility, which would make it particularly unsafe for him to be on an adult bed even for a short period of time. Typer's mother testified that Bolze-Sann had again assured her she would never place an infant in an adult bed for naps.

But some time during the morning on July 2, 2007—according to trial testimony, between 10:30 and 11:30 a.m.—Bolze-Sann placed Typer down for a nap on a queen-sized bed in the bedroom of her teenage daughter. She arranged a ring of pillows and

blankets around Typer. She checked on Typer around 12:30 p.m. and noticed he had moved within the ring of pillows; she moved Typer back to the center of the ring. Trial testimony from police officers indicated that Bolze-Sann at some point claimed to have checked on Typer at least one more time. Bolze-Sann later experienced a migraine headache, and she took a muscle relaxer and rested on the couch. Her daughter came home and heard Typer crying, but Bolze-Sann said not to get him because she had just laid him down for a nap.

Bolze-Sann's daughter eventually went to her bedroom to take a nap, but she never saw Typer and assumed he was sleeping in a different room. About an hour later, Bolze-Sann discovered Typer wedged between the mattress and footboard of the queen-sized bed. He was unresponsive. Bolze-Sann directed her daughter to call 911 and began performing CPR. Emergency responders could not detect any cardiac activity or signs of blood circulation on their arrival. Typer was pronounced dead a short time later. An autopsy revealed respiratory failure, secondary to positional asphyxia (*i.e.*, his respiratory passages were obstructed), which resulted in suffocation and caused his death.

ANALYSIS

Three of Bolze-Sann's appellate issues allege that the State failed to present sufficient evidence. In each, she focuses on an alleged failure of the State to prove that her conduct was reckless. She essentially makes the same factual argument regarding the meaning of recklessness in each of the three issues, but she recasts the basis for her arguments by phrasing them in terms of the State's failure to present sufficient evidence of: (1) probable cause at her preliminary hearing; (2) the elements at trial; and (3) each of the alternative means of involuntary manslaughter presented to the jury—*i.e.*, an

6

unintentional killing done recklessly or an unintentional killing done in the commission of aggravated endangering a child. See K.S.A. 21-3404(b) (defining involuntary manslaughter); K.S.A. 21-3608a(a)(2) (defining aggravated endangering a child). Under any theory, Bolze-Sann's arguments fail.

ISSUE 1: *The district court properly denied Bolze-Sann's pretrial motion to dismiss.*

We first address her argument that the district court erred in denying her pretrial motion to dismiss. In the motion, she argued the evidence at her preliminary examination was insufficient, as a matter of law, to establish probable cause that she had committed the crimes of aggravated endangering a child or involuntary manslaughter. See K.S.A. 22-2902 (defining State's burden of establishing probable cause during preliminary examination). The district court denied the motion. On appeal, the State asserts Bolze-Sann filed her motion to dismiss outside the statutory time limit for such motions. The State's argument determines this issue.

K.S.A. 22-3208(4) defines the time limits for filing a motion to dismiss. At the time of Bolze-Sann's motion, the statute required a defendant to seek dismissal no later than "20 days after the plea is entered." See L. 2010, ch. 135, sec. 18 (extending the time period from 20 days to 21). The failure to comply with this time limitation "constitutes a waiver and precludes review on appeal." *State v. McClain*, 258 Kan. 176, 185, 899 P.2d 993 (1995); see also *State v. Weigel*, 228 Kan. 194, 201, 612 P.2d 636 (1980); *State v. Smith*, 215 Kan. 34, 37, 523 P.2d 691 (1974).

Here, Bolze-Sann filed her motion to dismiss more than 100 days after she entered her plea. Accordingly, under the plain language of K.S.A. 22-3208(4), her motion was

7

untimely, and she has waived her argument regarding the district court's handling of her motion. See *McClain*, 258 Kan. at 185.

ISSUE 2: *Sufficient evidence supported Bolze-Sann's convictions.*

We next address Bolze-Sann's argument that there was insufficient evidence at trial to sustain her convictions of involuntary manslaughter and aggravated endangering a child.

"'When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Ortega*, 300 Kan. 761, 769, 335 P.3d 93 (2014) (quoting *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 [2012]). In reviewing all the evidence in the light most favorable to the prosecution, we will not "reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *Raskie*, 293 Kan. at 920. Rather, we examine all the evidence favorable to the prosecution against "the essential elements of a charge" to see if sufficient evidence supported all necessary elements. *State v. Pratt*, 255 Kan. 767, 768, 876 P.2d 1390 (1994); see *State v. Murray*, 285 Kan. 503, 537-38, 174 P.3d 407 (2008), *abrogated on other grounds by State v. Marshall*, 294 Kan. 850, 281 P.3d 1112 (2012).

Here, the district court instructed the jury that to establish the essential elements of involuntary manslaughter the State had to prove that Bolze-Sann unintentionally killed Typer and that the killing was done either *recklessly* or while in the commission of a felony. In this case, the underlying felony was charged as aggravated endangering a child.

8

See K.S.A. 21-3404(b). To find Bolze-Sann guilty of aggravated endangering a child, the jury had to be unanimously convinced beyond a reasonable doubt that she *recklessly* caused or permitted Typer to be placed in a situation in which his life, body, or health was injured or endangered. See K.S.A. 21-3608a(a)(2).

In focusing on the insufficiency of the evidence of recklessness, an element of both involuntary manslaughter and aggravated endangering a child, Bolze-Sann argues her conduct was not "reckless" for two reasons. First, she contends the State did not show that she realized or should have realized the particular danger of positional asphyxiation. Second, Bolze-Sann disputes whether any danger was "imminent." Neither argument has merit.

2.1. *The State need not prove realization of a specific danger.*

Kansas' criminal intent statute defines reckless conduct as "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." K.S.A. 21-3201(c). We have held that "[t]o act recklessly, a defendant must know that he or she is putting others in imminent danger." *State v. Gatlin*, 292 Kan. 372, 377, 253 P.3d 357 (2011). Importantly, one can act recklessly even without foreseeing "the particular injury that results from his or her conduct. [Citations omitted.]" 292 Kan. at 377; see *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012) (looking for an act "performed with knowledge the victim is in imminent danger," even if the ultimate injury—death—was not foreseen).

Applying these principles to this case, we hold there is sufficient evidence from which a reasonable jury could conclude that Bolze-Sann (1) realized the danger to Typer

in allowing him to nap on an adult bed and (2) consciously and unjustifiably disregarded that danger. For example, a childcare licensing surveyor testified at trial that she personally inspected Bolze-Sann's daycare in February 2007. At that visit, Bolze-Sann confirmed she had appropriate napping facilities for infants and was aware of and understood state regulations requiring that infants nap in a playpen or crib. Also, the repeated conversations between Bolze-Sann and Typer's parents provided an additional warning that she should not put Typer on an adult bed. Her response and repeated assurance that she would not do so suggests she understood a potential danger existed.

Trial testimony regarding Bolze-Sann's actions the day of Typer's death further supported this conclusion: She placed a "barrier ring" of pillows and blankets around Typer on the bed, suggesting she knew there was a danger that he might fall off the bed. At one point, she found that he had moved within the ring; she responded by picking him up and moving him back to the center of the ring, again suggesting she understood the risk of him falling off the bed's surface. Still, she did not move him to a playpen or crib.

Further, we are not persuaded by Bolze-Sann's argument regarding K.A.R. 28-4-116(b). This regulation requires a daycare facility to provide, for each child under 18 months old, a crib or playpen for napping. Bolze-Sann contends the regulation was only meant to prevent children from falling off beds and being trampled. Her argument finds some support from an unpublished Court of Appeals memorandum opinion. See *State v. Stahlhut*, No. 73,866, unpublished opinion filed November 22, 1996 (Kan. App.).

In *Stahlhut*, the State charged a daycare provider with endangering a child after she placed an infant on a waterbed for a nap and the infant suffocated when he became lodged between the mattress and the bed frame. K.A.R. 28-4-116(b)(2)(A) was in place at

10

that time, and the State introduced evidence that Stahlhut's actions violated the regulation. During the trial, a witness testified the regulation was designed to prevent a child from falling from the bed and being trampled. Other testimony established that most asphyxiation dangers were not unique to beds, sofas, or waterbeds and that the danger also existed in cribs and playpens. The jury convicted Stahlhut, but on appeal the Court of Appeals concluded that the district court had abused its discretion by admitting evidence of the regulation because—in light of this trial testimony—K.A.R. 28-4-116(b)(2)(A) was "not relevant to prove suffocation is a foreseeable danger of placing a child to nap outside of a crib or playpen." *Stahlhut*, No. 73,866, slip op. at 10; but see slip op. at D-5 (Marquardt, J., dissenting) (contending that "[t]he purpose of [K.A.R. 28-4-116] was to protect the health and welfare of children," and concluding that the regulation was "very relevant" to the infant's death by suffocation).

There are several problems with Bolze-Sann's argument. First, the district court was not bound by *Stahlhut*. See Supreme Court Rule 7.04(g)(2) (2014 Kan. Ct. R. Annot. 63) (stating that an unpublished memorandum opinion is not binding precedent [subject to exceptions not relevant here] and is not favored for citation). Second, the evidence in this case regarding the purpose of the regulation differed from the evidence in *Stahlhut*. Here, a childcare licensing surveyor testified that preventing trampling was "part" of the reason and "one" of the purposes of K.A.R. 28-4-116(b). The primary danger contemplated by the regulation is a fall from the bed. Here, a reasonable jury could conclude that falling off the bed was the proximate cause of Typer's death and that Bolze-Sann knew of this danger and disregarded it. See *State v. Anderson*, 270 Kan. 68, 73-74, 12 P.3d 883 (2000) (explaining that the State sufficiently proves its case by showing that the defendant could have reasonably foreseen harm as a result of what she did or failed to do). Finally and perhaps most significantly, the State did not need to prove Bolze-Sann

11

foresaw the precise danger of suffocation so long as imminent danger from her conduct was foreseeable. See, *e.g.*, *Gatlin*, 292 Kan. at 377; *cf. State v. Fisher*, 230 Kan. 192, 199, 631 P.2d 239 (1981) (explaining, with respect to the endangering a child statute, that it was meant "to protect children, and to prevent their being placed where it is reasonably certain that injury will result").

We note that a reasonable jury could have concluded that Bolze-Sann's conduct was not reckless. A jury might, for example, have found that Bolze-Sann's actions in creating a barrier ring of pillows showed that she did *not* consciously and unjustifiably disregard imminent danger. But the State's point at oral argument is well taken:  At this stage we must view all the evidence in the light most favorable to the prosecution, and, viewed in this light, Bolze-Sann's actions demonstrate she was well aware that it was dangerous to allow an infant to nap on an adult bed and, especially given the warnings by Typer's parents, that she consciously disregarded the danger. See *Ortega*, 300 Kan. at 769.

2.2. *Evidence established that the danger was imminent.*

As for Bolze-Sann's second attack on the evidence regarding recklessness, we conclude there was sufficient evidence from which a reasonable jury could conclude the danger was imminent. See K.S.A. 21-3201(c) (requiring conduct showing a "realization of the imminence of danger"). We have explained that the term "imminent" refers to a broader time frame than the term "immediate," although the term "'is not without limit'" and refers to a danger "'near at hand.'" *State v. White*, 284 Kan. 333, 351, 161 P.3d 208 (2007) (quoting *State v. Hernandez*, 253 Kan. 705, 713, 861 P.2d 814 [1993]); *cf. State v. Cummings*, 297 Kan. 716, 722, 305 P.3d 556 (2013) (discussing "*may* be injured or

12

endangered" element in K.S.A. 21-3608[a], which contrasts with the element in K.S.A. 21-3608a[a] criminalizing aggravated endangering a child, meaning, as relevant here, recklessly causing a child to be placed in a situation where his or her life, body, or health *is* injured or endangered).

Certainly, Typer apparently napped without incident for a period of time and did not immediately die from positional asphyxia after Bolze-Sann placed him on the bed. Still, she put Typer in a continuous state of danger. The risk of injury existed the entire time Typer was on the bed because his fall from the bed could have come at any time. The constant risk of injury while Typer napped made the danger imminent. See *State v. Jenkins*, 272 Kan. 1366, 1369-75, 39 P.3d 47 (2002) (determining there was sufficient evidence for a jury to conclude that a motorist who had seven prior accidents in 9 years due to seizures knew of the imminent danger he created by driving, even though the defendant may have driven many times without incident).

Even if we were to nominally credit Bolze-Sann's argument that Typer was not in imminent danger when placed on the bed, there is still sufficient evidence of Bolze-Sann's recklessness. The State introduced uncontroverted testimony that Bolze-Sann heard Typer crying before his death but, instead of responding to his cries, remained on the couch and even instructed her daughter not to go check on him. Bolze-Sann ignored Typer's crying for at least 15 to 20 minutes according to Bolze-Sann's daughter, and there was testimony from an investigator that during a first interview Bolze-Sann stated Typer had cried for 30 minutes and then she did not check on him for 40 more minutes after the crying had stopped. A reasonable jury could conclude from this testimony that danger was indeed imminent and near at hand. This seems especially true given the evidence that Typer was increasingly mobile and the related logical inference that he might have

13

attempted to move himself during his agitation. Yet, Bolze-Sann ignored him. See *White*, 284 Kan. at 351.

Accordingly, a reasonable jury could conclude from the evidence that Bolze-Sann anticipated danger and yet pursued a course of action contrary to the regulations, contrary to what she knew to be proper procedure, and contrary to the parents' express warnings. She then failed to check on Typer even after he had cried for at least 15 to 20 minutes. We are satisfied that a rational jury could have found the essential element of reckless conduct and could have found Bolze-Sann guilty beyond a reasonable doubt. See *Ortega*, 300 Kan. at 769; *Pratt*, 255 Kan. at 768.

Accordingly, we affirm the Court of Appeals' conclusion on this issue.

ISSUE 3: *The alternative means jury instruction did not violate Bolze-Sann's right to a unanimous jury verdict.*

In a related challenge, Bolze-Sann notes that the district court instructed on two means of committing involuntary manslaughter—the unintentional killing of Typer (1) "recklessly" or (2) "while in the commission of aggravated endangering of a child." Once again focusing on the element of recklessness, Bolze-Sann contends she was deprived of her right to a unanimous jury verdict because the State failed to present substantial evidence on each of the alternative means.

"'"[W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means."'" *State v. Brown*, 295 Kan. 181, 188, 284 P.3d

14

977 (2012) (quoting *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 [1994]; *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]).

The State does not dispute that the instructions presented the jury with two alternate ways to commit the crime of involuntary manslaughter. See *Brown*, 295 Kan. at 188; see also 295 Kan. at 194-200 (describing the difference between alternative means and options within a means). We, too, find it unnecessary to analyze whether the court instructed the jury on alternative means because, even if it did, there was substantial evidence as to each means.

Bolze-Sann's focus here is again on the recklessness element that is essential to both charges. And, as we explained above, the State presented sufficient evidence that Bolze-Sann's conduct was reckless. In fact, Bolze-Sann somewhat concedes that our determination of her sufficiency of the evidence challenge controls our resolution of this issue. Accordingly, in light of our conclusion that there was sufficient evidence from which a reasonable jury could conclude she acted recklessly, we affirm the Court of Appeals' conclusion that Bolze-Sann was not deprived of her right to a unanimous jury verdict.

ISSUE 4: *The district court did not clearly err by declining to define "imminence" for the jury.*

Bolze-Sann's next argument involves the jury instruction defining "reckless conduct" as "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." Bolze-Sann contends the district court clearly erred by failing to give a jury instruction defining the term "imminence," as this term is not a matter of common

15

knowledge and there is a real possibility the jury would have reached a different verdict had it been instructed that "imminence" does not refer to a time period without limit and refers to a danger near at hand. See *White*, 284 Kan. at 351.

When analyzing jury instruction issues, we follow a three-step process:

"(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless. " *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

Our first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step. See, *e.g.*, *State v. Briseno*, 299 Kan. 877, 882, 326 P.3d 1074 (2014) (describing a "higher hill for a party that fails to request an instruction"); *Williams*, 295 Kan. at 515-16; see also K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). Here, Bolze-Sann did not object to the lack of a specific definition for "imminence," nor did she propose such a definition. Hence, Bolze-Sann must establish clear error.

At the second step of determining whether there was any error at all, we "'consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.'" *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *Williams*, 295 Kan. 506, Syl. ¶ 4); see also *State v. Plummer*, 295 Kan. 156, 160-63, 283 P.3d 202 (2012) (utilizing a four-step review of jury instructions,

16

in which the second and third step ask whether any error occurred, first from a legal standpoint and then from a factual one).

While the district court has a duty to instruct the jury on the law that applies in a particular case, a district court does not have to provide the jury a definition for widely used words or those readily comprehensible by individuals of common intelligence. *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014); *State v. Roberts-Reid*, 238 Kan. 788, 789, 714 P.2d 971 (1986). In general, jurors are "expected to decipher many difficult phrases without receiving specific definitions." *State v. Robinson*, 261 Kan. 865, 877, 934 P.2d 38 (1997). A district court should only define additional terms if the instructions as a whole would otherwise mislead the jury or cause it to speculate. *Armstrong*, 299 Kan. at 440.

Applying these concepts to Bolze-Sann's arguments, we conclude the district court did not err by failing to define the word "imminence." Bolze-Sann does not cite any Kansas appellate law suggesting that a district court must define "imminence" for the jury. The term is widely used and readily comprehensible. *Armstrong*, 299 Kan. at 440; see also *People v. Lopez*, 199 Cal. App. 4th 1297, 1306-07, 132 Cal. Rptr. 3d 248 (2011) ("There is no reasonable likelihood jurors would fail to understand the difference between imminent danger and future harm . . . ."); *Com. v. Thomas*, 2005 Pa. Super. 245, 879 A.2d 246, 265-66 & n.11 (Pa. Super. 2005) (reaching a similar conclusion after considering the jury charges as a whole). If anything, our lack of caselaw affirmatively directing that a definition be given supports the idea that the term does not need to be defined in most circumstances.

As cited by Bolze-Sann, in other cases parties have disputed the extent to which "imminent" differed from "immediate" with regard to the availability of self-defense or defense of others. See *White*, 284 Kan. at 351; *Hernandez*, 253 Kan. at 711-13; *State v. Osbey*, 238 Kan. 280, 282-83, 710 P.2d 676 (1985). "Immediate" refers to a danger even nearer at hand than an "imminent" danger. So even if Bolze-Sann's jury had confused the terms, any mistake could only have helped her because the jury would have looked for an even closer danger than the law required. See *White*, 284 Kan. at 351.

Furthermore, Bolze-Sann does not actually contend the lack of an explicit definition for the term "imminence" would mislead the jury or cause it to speculate, which are our two recognized exceptions to the general rule that jurors can decipher the meaning of commonly understood words without the benefit of a court-supplied definition. See *Armstrong*, 299 Kan. at 440; *Robinson*, 261 Kan. at 877. Instead, she asserts that an instruction defining "imminence"—and, more specifically, defining the term as it was defined in *White*—would have "helped" and "better focused" the jury. Regardless, the fact that a definition would have been generally beneficial is not, under our precedent, sufficient to transform the omission of such a definition into a legal error. See *Armstrong*, 299 Kan. at 440; *Robinson*, 261 Kan. at 877.

Because there was no error, we need not reach the final step of our analysis, *i.e.*, the determination of whether an error in the jury instructions constituted clear error. See *Williams*, 295 Kan. at 510; *Roberts-Reid*, 238 Kan. at 790.

Accordingly, we hold that no error—let alone clear error—occurred with respect to the omission of a definition of "imminence" from the jury instructions.

18

ISSUE 5: *The district court did not err in refusing to issue Bolze-Sann's limiting instruction regarding the evidentiary value of a state regulation.*

Bolze-Sann's next jury instruction argument is that the district court committed reversible error by declining to instruct the jury as to how it could consider evidence related to K.A.R. 28-4-116.

At the instruction conference, the district court proposed the following instruction:

"During trial you heard testimony regarding [K.A.R.] 28-4-116, which provides:

'(b) Napping and sleeping.

(2) Napping facilities or sleeping facilities for evening and overnight care shall be provided as follows:

(A) A crib or playpen with slats not more than 2-3/8 inches apart or equipped with bumpers shall be used for each child under 18 months.'

"This regulation applies to licensed daycare providers and exists to promote the safety of young children. It governs napping during the day, and sleeping during evening and overnight hours. Accordingly, the regulation applied to Ms. Bolze-Sann when she put Zachary Typer down for a nap during the daylight hours of July 2, 2007."

Bolze-Sann objected to the instruction on the grounds that K.A.R. 28-4-116 was not meant to prevent the harm suffered by Typer (positional asphyxiation) and thus it was not relevant to show whether the harm was foreseeable to her. Additionally and in the alternative, she argued that the district court should add the following language:

19

"You are further instructed that K.A.R. 28-4-116(b) is not intended to protect infants from suffocation and should not be considered by you in determining whether or not the defendant should have considered that the placing of the child in this manner down for a nap outside of a crib was a foreseeable danger and then taken steps to prevent or address that danger."

The district court overruled Bolze-Sann's objection and also declined to add her proposed language. On appeal, Bolze-Sann only challenges the district court's refusal to add her requested language.

As outlined above, we review jury instruction issues pursuant to a stair-step analysis. See *Williams*, 295 Kan. at 510. Because Bolze-Sann unambiguously opposed the proposed instruction and in the alternative requested additional language, she fully preserved her argument. Consequently, we will reverse if we find an error and conclude that there is a "reasonable probability" that the error affected the outcome of the trial in light of the entire record. *State v. Ward*, 292 Kan. 541, 565, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see *State v. Andrew*, 301 Kan. 36, 40, 340 P.3d 476 (2014) (finding that a party preserved an instructional issue for appellate review by articulating specific reasons for an objection).

Once again, Bolze-Sann's primary support for her argument is the unpublished Court of Appeals memorandum opinion in *Stahlhut*, which we previously discussed in the context of Bolze-Sann's sufficiency-of-the-evidence challenge. See *State v. Stahlhut*, No. 73,866, unpublished opinion filed November 22, 1996 (Kan. App.). As we noted in that discussion, there are several factual distinctions between *Stahlhut* and this case. These factual distinctions cause us to examine whether Bolze-Sann's proposed instruction was factually appropriate.

20

To reiterate some salient points from our prior discussion, even if we were to accept Bolze-Sann's very limited view of the regulation's purpose, the regulation was designed, at least in part, to prevent a child's fall from a bed. And Bolze-Sann overlooks the fact that Typer did in fact fall off the bed in this case. Typer was caught by the footboard, but the proximate cause of Typer's injury was falling off the bed. *Stahlhut* is further distinguishable because, in contrast to the evidence admitted in *Stahlhut*, here there was no trial testimony about how Typer was at risk of suffocation in a crib or playpen. Also, the childcare licensing surveyor did not conclusively suggest that the *only* purpose of K.A.R. 28-4-116(b) was to prevent children from rolling off the bed and being trampled—instead, she testified that this was "part" of the reason and "one" of the purposes. Thus, the evidence in Bolze-Sann's trial did not support the language she requested in her proposed instruction.

Accordingly, Bolze-Sann's proposed limiting instruction regarding the use of K.A.R. 28-4-116(b) was not factually appropriate, and her suggestion that the jury could not consider the regulation in determining whether there was *any* foreseeable danger associated with her conduct must fail.

ISSUE 6: *The district court's response to the deliberating jury's question was harmless error.*

During its deliberations, the jury sent a note to the district court regarding the instruction for involuntary manslaughter, which read: "Is there any other alternate definition meaning to the verb, killed?" The district court conferred with the State and Bolze-Sann's counsel regarding the appropriate response, but the record does not indicate whether Bolze-Sann herself was present. With the assent of both attorneys, the district

21

court responded to the jury's question in writing, stating: "There's nothing additional for the Court to add. Please refer to instructions already given."

Bolze-Sann contends the district court's handling of the jury's question presents two related but distinct errors: First, the district court erred by discussing the question outside her presence; second, the district court erred by sending a written response instead of reading the response to the jury in open court. The record is, as point of fact, not clear as to whether Bolze-Sann was present during these proceedings, and thus we must presume that she was not. See *Herbel*, 296 Kan. at 1107-08.

In asserting her claims of error, Bolze-Sann argues the district court failed to comply with K.S.A. 2014 Supp. 22-3405(a) and K.S.A. 22-3420(3). K.S.A. 2014 Supp. 22-3405(a) provides that a "defendant in a felony case shall be present . . . at every stage of the trial . . . , except as otherwise provided by law." K.S.A. 22-3420(3), at the time of Bolze-Sann's trial, in relevant part, provided:

> "After the jury has retired for deliberations, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel after notice to the prosecuting attorney."

After Bolze-Sann's trial, the legislature amended K.S.A. 22-3420, effective July 1, 2014, with the intent that any amendments would apply retroactively. K.S.A. 2014 Supp. 22-3420(f). The State has not asked us to apply this statute, and the parties have not briefed whether retroactive application is appropriate. We, therefore, will not consider the potential impact of these amendments.

22

Bolze-Sann further asserts that the district court's failure to discuss the answer in her presence or to convey the answer to the jury in open court gives rise to three constitutional claims involving her rights to be present at every critical stage of her trial, to have a public trial, and to have the benefit of an impartial judge. See *State v. Bowen*, 299 Kan. 339, 354, 323 P.3d 853 (2014) (reviewing same arguments de novo); see also *State v. Verser*, 299 Kan. 776, 787, 326 P.3d 1046 (2014) (reviewing de novo an appellate argument regarding "a defendant's right to be present at every critical stage of his or her criminal trial").

### 6.1 *Right to be present at every critical stage of trial*

Both the United States Constitution and Kansas statutory law guarantee a criminal defendant the right to be present at every critical stage of the proceeding. See U.S. Const., amend. 6; K.S.A. 22-3405(1); K.S.A. 2014 Supp. 22-3405(a); see also *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (explaining that the Due Process Clause extends the Confrontation Clause of the Sixth Amendment "in some situations where the defendant is not actually confronting witnesses or evidence against him").

In past cases, this court has explained the statutory and constitutional right to be present extends to any period in which the court is conferring with the parties about an appropriate response to a jury question and when the response is communicated to the jury. See *Herbel*, 296 Kan. at 1109; see also *Bowen*, 299 Kan. at 353-54 (district court violated defendant's statutory and constitutional rights by answering a jury inquiry during deliberations with a written note delivered by court personnel instead of the trial judge

replying in open court); *Verser*, 299 Kan. at 787-88 (questions from the jury must be answered in open court in the defendant's presence unless the defendant is voluntarily absent); *State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013) (defendant's rights violated when not present when court conferred with counsel about answer or when court communicated with jury); *State v. McGinnes*, 266 Kan. 121, 127, 967 P.2d 763 (1998) (same, and listing additional precedential cases).

Application of K.S.A. 2014 Supp. 22-3420 may require us to examine the continued viability of the rationale of these cases. But, as we have noted, the State has not asked us to do that in this appeal. In fact, the State does not even argue against a finding of error. It, thus, essentially concedes a violation of K.S.A. 22-3420 occurred and that there was a corresponding violation of the constitutional right to be present during a trial. The State focuses solely on harmless error. Because we agree with the State that the error was harmless, we will also move directly to a harmless error review and, assuming a constitutional error, will apply the constitutional harmless error statute. See *Rushen v. Spain*, 464 U.S. 114, 117 n.2, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) ("Because we find that no actual prejudice was shown, we assume, without deciding, that respondent's constitutional right[] to presence . . . [was] implicated in the circumstances of this case."); see also *Verser*, 299 Kan. at 789-90 (applying constitutional harmless error standard); *Herbel*, 296 Kan. at 1109-10 (same).

Under the constitutional harmless error standard, we may declare an error harmless only if "'the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Verser*, 299 Kan. at 789 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6); see

*Chapman v. California*, 386 U.S. 18, 22-23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (declining to reverse for constitutional errors that do not affect the substantial rights of a party).

Several factors help determine whether a violation of this right is harmless beyond a reasonable doubt:  (1) the overall strength of the case against the defendant; (2) whether either party objected to the manner in which the judge handled the communication; (3) whether the judge's communication with the jury "concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter," and also how the communication was conveyed to the jury; and (4) the ability of any posttrial remedy to "mitigate the constitutional error." *McGinnes*, 266 Kan. at 132-37; see *Herbel*, 296 Kan. at 1111.

Again, given the evidence, a reasonable jury could have—and did—convict Bolze-Sann; but the evidence was not so strong as to foreclose a reasonable jury from concluding she was not reckless. Hence, the first factor weighs against the State's argument. But all other factors weigh in favor of finding the error harmless. Bolze-Sann's counsel did not object to the district court's procedure. As to the effect of the error, the present dispute, like in *Bowen*, focuses on the procedure used to answer the jury's question rather than the answer's "substantive content." See *Bowen*, 299 Kan. at 358. And the district court did not provide the jury with additional information or information of any import. Instead, the district court merely instructed the jury to refer to the previously provided instructions. Bolze-Sann makes no argument that the content of the district court's response was in any way prejudicial or inaccurate; in fact, the content of the response was entirely innocuous and insignificant. See *Herbel*, 296 Kan. at 1111 (looking to whether the ex parte communication concerned a "critical aspect of the trial").

Additionally, Bolze-Sann's counsel did not seek any posttrial remedy on these grounds. See *State v. Herbel*, 296 Kan. 1101, 1111, 1114-15, 299 P.3d 292 (2013).

We conclude that the State has carried its burden to show that any error was harmless beyond a reasonable doubt—there is no reasonable possibility that Bolze-Sann's presence during the discussion of the jury's question or her presence during the communication of the response to the jury would have had any effect on the outcome of her trial. See *Verser*, 299 Kan. at 789; *McGinnes*, 266 Kan. at 132-33. Indeed, Bolze-Sann does not actually argue to the contrary: She focuses her entire argument on the fact that a violation occurred, but she has given us no reason to conclude that her presence would have made any difference. *Cf. Gagnon*, 470 U.S. at 526 (explaining that "a defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge'" [quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934)]).

Accordingly, we decline to reverse Bolze-Sann's conviction on this ground.

6.2 *Rights to a public trial and an impartial judge*

Although a violation of a defendant's right to be present may be harmless—and, indeed, "'most constitutional errors can be harmless'"—a "'very limited class of cases'" involve structural errors subject to automatic reversal. *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 [1991], and *Johnson v. United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 [1997]); see also *Fulminante*, 499 U.S.

26

at 309-310 (describing why certain structural errors affect the framework of the trial and thus "defy analysis by 'harmless-error' standards"). Both the denial of the right to a public trial and the right to an impartial judge have been categorized as structural errors by the United States Supreme Court, with the Court holding that the right to a public trial and the right to an impartial judge are so central to the trial framework that the denial of these rights would "'infect the entire trial process'" and no prejudice need be shown. *Neder*, 527 U.S. at 8 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 [1993]); see *Fulminante*, 499 U.S. at 310; see also *Waller v. Georgia*, 467 U.S. 39, 49, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) ("[T]he defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee."); *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927) ("No matter what the evidence was against [the defendant], he had the right to have an impartial judge.").

Nevertheless, Bolze-Sann has not met an all-important initial threshold—she has not shown that such structural error actually occurred. We have never characterized a district court's failure to comply with the deliberating jury procedures provided in K.S.A. 22-3420(3) or later statutes as a violation of the constitutional rights to a public trial or an impartial judge. And Bolze-Sann presents no authority supporting her argument in favor of such an extension of our law. Faced with virtually identical arguments in *Verser*, 299 Kan. at 791, and *Bowen*, 299 Kan. at 355-56, we declined to address these arguments; we noted that pressing a point without pertinent authority is akin to failing to brief an issue, which results in a party waiving or abandoning the argument. See *State v. Torres*, 280 Kan. 309, 331, 121 P.3d 429 (2005). We reach the same conclusion in this case.

27

ISSUE 7:  *Bolze-Sann failed to preserve her jury polling argument.*

Bolze-Sann's final argument is that the district court committed reversible error during its postverdict jury poll by failing to inquire whether the verdict was the jury's. She acknowledges she did not object to this failure at the time but nonetheless urges us to consider the issue on appeal because it involves a question of law based on undisputed facts and because it implicates her fundamental right to a unanimous jury verdict. See *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010) (reiterating three recognized exceptions to the general rule that constitutional issues cannot be raised for first time on appeal, specifically:  "[1] The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; [2] consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and [3] the district court is right for the wrong reason.").

The State, on the other hand, insists that Bolze-Sann's failure to object means she has not adequately preserved the issue for appeal. We agree. Our past cases have made clear that failing to raise a jury polling issue before the district court, either contemporaneously or in a posttrial motion, precludes appellate review. See *State v. Brown*, 298 Kan. 1040, 1055-56, 318 P.3d 1005 (2014) (asserted exceptions to the preservation rule do not apply because right to unanimous jury verdict is not a fundamental right and any consideration of jury unanimity necessarily involves factual review); *State v. Cheffen*, 297 Kan. 689, 698-99, 303 P.3d 1261, *cert. denied* 134 S. Ct. 627 (2013) ("[T]he better rule is to require a party wishing to challenge the trial court's compliance with the procedures set out in K.S.A. 22-3421 for inquiring about a jury's verdict to have raised that issue first with the district court either in the form of a contemporaneous objection or a posttrial motion.").

28

Accordingly, we decline to review Bolze-Sann's argument.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

\* \* \*

STEGALL, J., concurring: I concur fully with the result and reasoning of the majority opinion. But I write separately to address our confused caselaw on the limited question of whether a judge answering a jury question with a written note, as distinct from giving an oral answer in open court, violates the Sixth Amendment's requirement that a defendant be present at every critical stage of the proceeding. Our majority opinion today acknowledges, in passing, the uneven history I discuss below. But the State conceded error, thus obviating any need or opportunity to revisit the question and bring needed clarity to this unsettled area of criminal procedure.

The time-tested and well-worn trial procedure at issue here—whereby after a deliberating jury has sent a written question to the trial judge, the judge first holds a hearing with counsel in the presence of the defendant concerning the proper answer, and second delivers a written answer to the jury—has been so common in our history as to have become rote and unremarkable. See *Shields v. United States*, 273 U.S. 583, 588, 47 S. Ct. 478, 71 L. Ed. 787 (1927) (permitting a written answer to a jury question after proper hearing and opportunity to object). Since 2012, however, the issue has spawned significant litigation and at least five different and contradictory opinions from this court. See *State v. Burns*, 295 Kan. 951, 287 P.3d 261 (2012); *State v. Wells*, 296 Kan. 65, 290

29

P.3d 590 (2012); *State v. King*, 297 Kan. 955, 305 P.3d 641 (2013); *State v. Bowen*, 299 Kan. 339, 323 P.3d 853 (2014); and *State v. Verser*, 299 Kan. 776, 326 P.3d 1046 (2014). And the cases continue to arrive on our steps, as evidenced by today's decision.

In addition to deciding whether this procedure violates the Sixth Amendment, we have simultaneously considered whether it comports with K.S.A. 22-3420 which, prior to its amendment, provided in part:

> "After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself." K.S.A. 22-3420(3).

The legislature, perhaps in response to some of our decisions discussed below, amended this statute, effective July 1, 2014, to read:

> "The jury shall be instructed that any question it wishes to ask the court about the instructions or evidence should be signed, dated and submitted in writing to the bailiff. The court shall notify the parties of the contents of the questions and provide them an opportunity to discuss an appropriate response. The defendant must be present during the discussion of such written questions, unless such presence is waived. The court shall respond to all questions from a deliberating jury in open court or in writing. . . . The defendant must be present during any response if given in open court, unless such presence is waived." K.S.A. 2014 Supp. 22-3420(d).

The 2014 amendments to K.S.A. 22-3420 were intended to apply retroactively. See K.S.A. 2014 Supp. 22-3420(f). As we note today, however, the application of K.S.A.

30

2014 Supp. 22-3420(d) to Bolze-Sann was not advocated by the State and is not properly before us. As such, a determination of that statute's retroactivity and constitutionality must wait for another day.

The source of our recent confusion over the permissibility of this procedure may stem from the long established and unquestioned rule that a judge may not engage in ex parte communications with a deliberating jury—*i.e.*, the judge cannot orally communicate to a jury without the defendant's presence. For example, in *Crease v. State*, 252 Kan. 326, 845 P.2d 27 (1993), the district court conducted an ex parte communication with at least one juror in chambers, absent the presence of any attorneys or the defendant, to discuss the application of the felony-murder rule to the case. The *Crease* court had no difficulty finding that "'a conference between a trial judge and a juror is a critical stage of the proceeding'" and the Sixth Amendment right to be present attaches. 252 Kan. at 333 (quoting *State v. Lovely*, 237 Kan. 838, Syl. ¶ 3, 703 P.2d 828 [1985]). The court went on then to say that "a defendant's constitutional and statutory right to be present includes the right to be present 'whenever the court communicates with the jury'" and that "K.S.A. 22-3420(3) requires that once the jury has begun deliberations, any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is absent voluntarily." 252 Kan. at 333.

Similarly, in *State v. McGinnes*, 266 Kan. 121, 967 P.2d 763 (1998), after the trial judge overheard a juror wonder aloud during deliberations why the chief of police had not testified at trial, the judge orally explained to the jury that the chief was away at training and unavailable. We found constitutional error because "the Sixth Amendment's

31

Confrontation Clause . . . require[s] the defendant's presence at every critical stage of a trial, including a conference between a trial judge and a juror." 266 Kan. at 127.

We did not contemplate or even mention in *Crease* or *McGinnes* the distinction between, on the one hand, an oral ex parte conference between a judge and jury and, on the other hand, utilizing a written note to deliver to the jury a communication settled on after consultation with both attorneys in the presence of the defendant. Our conflation of the narrow category of constitutional violations that occurs when a judge engages in an ex parte oral conference with a jury with the significantly broader statement that a defendant has a constitutional right to be present whenever a judge *communicates* with a jury—along with our incomplete summary of and reliance on K.S.A. 22-3420(3) for the proposition that *anytime* a jury asks a question it must be answered in open court—has proved a fertile seed bed for the flowering of litigation around this issue.

The distinction between an oral conference and "communication" writ large was first probed, though not definitively answered, in *State v. Coyote*, 268 Kan. 726, 1 P.3d 836 (2000). There, the jury sent two questions in writing to the trial judge. The judge answered both questions in writing, however, the judge only consulted the attorneys in the presence of the defendant when formulating his answer to the second question. The *Coyote* court first noted that "a conference between a trial judge and juror is . . . a critical stage and requires the presence of the defendant." 268 Kan. at 731 (citing both *Crease* and *McGinnes*). But the court was not dealing with oral conferences in *Coyote*, as it had been in *Crease* and *McGinnes*, only with written notes being passed between jury and judge.

Nonetheless, *Coyote* expanded the rulings of *Crease* and *McGinnes* to written communications in a manner that was, at best, confusing. With respect to the second jury question, the *Coyote* court said:

> "[T]he trial court followed Kansas statutory and case law in dealing with the jury question. The court advised counsel and the defendant of the question, provided all with an opportunity off the record for input, and after the hearing, resolved the question submitted. Then the court, in writing, answered the jury question." 268 Kan. at 731.

As to the first question, however, the court found constitutional error in the procedure followed by the trial court, stating:

> "A trial court, when confronted with a question submitted to it by a jury during deliberations is required to advise counsel, provide the parties with the question, and give them an opportunity for input in the presence of the defendant. Thereafter, the court is required to respond in writing to the jury in the presence of the defendant. . . .

> "K.S.A. 22-3420(3) explicitly requires that any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is absent voluntarily." 268 Kan. at 732.

Describing these two rulings as merely confusing may be generous as they appear to be contradictory. Certainly the *Coyote* court is consistent in holding that before a judge may answer a written question from the jury, the judge must consult with the attorneys in the presence of the defendant. But must the judge call the jury into open court in the presence of the defendant to "communicate" the answer to the jury? Here the *Coyote* court sows confusion.

33

This brings us to our recent spate of decisions on this question. Resolved by a unanimous court a mere 2 months apart, the first two decisions—*State v. Burns*, 295 Kan. 951, 287 P.3d 261 (2012); and *State v. Wells*, 296 Kan. 65, 290 P.3d 590 (2012)— appeared to settle the question. In *Burns*, the jury had submitted a written question which was answered in writing by the trial judge after consultation with the attorneys in the presence of the defendant, just as the *Coyote* court had described. But the defendant, relying on and citing the admonition in *Coyote* that such communication must occur in open court, argued "that sending an answer back to the jury rather than reading the answer in the presence of the defendant violate[d] his constitutional right to be present at all critical stages of the trial." *Burns*, 295 Kan. at 956. We disagreed, found no error, and in the process we clarified the holding of *Coyote*—"the trial court followed the procedure outlined by this court in *Coyote*. Burns and his counsel were present and informed of the jury's question" before the answer was submitted to the jury in writing. *Burns*, 295 Kan. at 956.

In reaching its conclusion, the *Burns* court did not discuss K.S.A. 22-3420(3), an oversight quickly remedied in *Wells.* There, confronted with substantially identical facts as we had been in *Burns*, and substantially identical arguments, we expanded our rationale for why neither *Coyote* nor K.S.A. 22-3420(3) required that a jury question be answered in open court with the defendant present. First, we held:

> "The plain language of K.S.A. 22-3420(3) does not support Wells' contention because the
> statute only requires the presence of the defendant if the jury, after making a request, is
> taken into the courtroom so it can receive information from the district court on a point of
> law. . . . Because the jury never asked to be returned to the courtroom so it could be
> informed on the legal definition of abets, the district court did not violate K.S.A. 22-

34

3420(3) by answering the jury's written question via a written note." *Wells*, 296 Kan. at 90-91.

Then we added, citing *Burns*:

"Our holding in *Coyote* was not based on the fact that the district court failed to answer the jury's question orally in open court while the defendant was present. Instead, our holding was based on the fact that the defendant was not present during the court's discussion with the attorneys on how to respond (in writing) to the jury's question. . . .

. . . .

"In other words, to ensure that a defendant's constitutional and statutory right to be present at critical stages of his or her trial is protected, a defendant must be present during the court's discussion with the attorneys and ultimate decision on how to respond to a written jury question. But there is no need that the court read the written answer it decided out loud to the jury in open court while the defendant is present. Simply delivering the answer the court decided upon to the jury via written note is sufficient to satisfy the defendant's right to be present." *Wells*, 296 Kan. at 91-92.

The *Burns* and *Wells* decisions should have ended both this court's discussion of this procedure and subsequent litigation over its use. Unfortunately, they did not. Eight months after *Wells*, in another unanimous decision, this court issued its opinion in *State v. King*, 297 Kan. 955, 305 P.3d 641 (2013). Again confronting substantially similar procedures and arguments as were dealt with in both *Burns* and *Wells*, the *King* court reached the opposite result. Specifically, the *King* court took issue with *Burns* and its reading of *Coyote*:

"The implication of the *Burns* decision, if not its clear message, is that it is not necessary to open court when delivering a written answer to a jury question, even if the defendant has not formally waived that procedure. However, the *Burns* decision did not

35

cite K.S.A. 22-3420(3), and it did not mention the rest of the *Coyote* court's analysis, which is contrary to the implication of the *Burns* decision." *King*, 297 Kan. at 966.

Finding support in "the rest" of the *Coyote* court's confusing and contradictory analysis, along with our earlier truncated summary statements concerning the requirements of K.S.A. 22-3420(3), *King* overruled *Burns* and held:

"[A]ny question from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is voluntarily absent. . . . [A]cts or omissions violating K.S.A. 22-3420(3) also violate . . . the guarantee of the Sixth Amendment to the United States Constitution that a criminal defendant may be present at every critical stage of his or her trial." *King*, 297 Kan. at 967-68.

This holding has subsequently been applied in two additional cases to reach this court. See *State v. Bowen*, 299 Kan. 339, 323 P.3d 853 (2014); *State v. Verser*, 299 Kan. 776, 326 P.3d 1046 (2014).

Curiously, whether decided rightly or wrongly, *King* did not tie up all the loose ends because *King* never considered the sound reasoning and contradictory holding in *Wells*. This is unfortunate because *Wells* is the better decision, as a matter of both caselaw and statutory interpretation and as a matter of constitutional law. *Wells* correctly interprets the *holding* of the *Coyote* decision rather than getting bogged down in the opinion's semantic difficulties. *Wells* is correct that K.S.A. 22-3420(3) only requires a judge to answer a jury question in open court with the defendant present *if* the jury first "request[s] the officer to conduct them to the court." See 296 Kan. at 90-91. When a jury chooses instead to simply send a written question to the court, the strictures of 22-3420(3), by its plain language, are not triggered. And finally, *Wells* sensibly finds that the

36

physical act of delivering a note is not the kind of "communication" contemplated by our earlier decisions finding a constitutional prohibition against ex parte conferences between a judge and jury. Indeed, it would be surprising if this innocuous procedure (which, unsurprisingly, has been deemed harmless at every turn even after we found it to be a constitutional violation) used so regularly as a convenient method of fairly communicating with a jury after deliberations have begun was suddenly discovered to run afoul of the Sixth Amendment to the Constitution.

Finally, it is true, as we have held today, that the State (unwisely perhaps) conceded the process used here was error pursuant to *King* and failed to even raise the possibility of revisiting the question based on the possible continuing viability of *Wells*. It is likewise true this case does not squarely present us with the question of whether to apply the new statutory procedure of K.S.A. 2014 Supp. 22-3420(d) that explicitly permits what *King* has declared unconstitutional. If it did, we would be required to answer the much more important question of whether that statute must be struck down as constitutionally infirm. But that case is surely coming.

ROSEN, J., joins in the foregoing concurring opinion.

37