NOT DESIGNATED FOR PUBLICATION

No. 120,040

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DERRICK L. BILLOUPS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed April 24, 2020. Affirmed in part, dismissed in part, sentence vacated, and case remanded with directions.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., HILL and STANDRIDGE, JJ.

POWELL, J.: Derrick Billoups was convicted by a jury of four counts of aggravated robbery, one count of reckless aggravated battery, and one count of felony theft from events stemming from the robberies of a Subway, two Presto gas stations, and a bank in the Wichita, Kansas, area over the course of four days. He also pled guilty to numerous other charges. Billoups now appeals his jury trial convictions and his prison sentence.

1

FACTUAL AND PROCEDURAL BACKGROUND

On March 13, 2015, Billoups was charged with numerous crimes relating to a spree of acts occurring earlier that month. Eventually, the State amended the charges to allege the following: four counts of aggravated robbery; eight counts of felony theft; and one count each of reckless aggravated battery, aggravated assault, fleeing or attempting to elude law enforcement, criminal possession of a weapon, possession of cocaine, and misdemeanor possession of marijuana. The following conduct prompted the State's charges.

1. *The Subway Robbery*

On the morning of March 7, 2015, Chase Guzman was working alone at a Subway restaurant in Wichita, Kansas. Shortly after Guzman opened the store for the day, a man entered the Subway with his face covered wearing a red coat, a brown hat, and a grey backpack with white stripes; and he was armed with what appeared to be a gun. Guzman noticed a spring on the alleged firearm. Billoups asserted at trial while questioning Guzman that the firearm was actually a BB gun. When Billoups asked Guzman at trial if he knew the gun was a BB gun, Guzman responded, "I was conflicted. I didn't know for sure. But I had my doubts about the gun." Nevertheless, Guzman complied when the man walked behind the counter, threw the backpack at him, and ordered him to fill the backpack with cash. The man fled the store with the $79 Guzman put inside of the backpack. Guzman called the police to report the crime. He told the responding officer that the robber was a black male approximately 5 feet 4 inches tall and weighing approximately 150 pounds. Surveillance video captured the robbery.

At trial, Guzman could not identify Billoups as the man who had robbed the Subway because the robber's face was covered. However, the State presented evidence that Billoups had, days prior to the Subway robbery, stolen a car from a car dealership

2

while wearing a red jacket like that worn by the Subway robber. The State also presented evidence that when Billoups was arrested he was in possession of a grey backpack and a brown beanie hat.

2.    *The Park City Presto Robbery*

On March 10, 2015, three days after the Subway robbery, Nick Griblin was working an overnight shift at a Presto gas station in Park City, Kansas. Around 3 a.m., a man with dark skin entered Presto wearing a brown beanie and Carhartt-type work clothing. The man told Griblin he wanted to purchase two cartons of Newport cigarettes. Griblin told the man he only had one carton and 10 single packs, and the man said that was fine. Griblin bagged the cigarettes and processed the transaction, but the man's card was declined. Suddenly, the man pulled out a pink can of mace and sprayed Griblin in the eyes. Griblin attempted to push the emergency button to alert the police, but he could not see because of the effects of the mace. He was able to reach for his phone and call his boss, who then called the police. Surveillance cameras captured the robbery.

A few days after the Park City Presto robbery, police asked Griblin if he could pick out his assailant from a photo lineup. Yet, at some point before showing Griblin the photo lineup, Griblin was allegedly shown a single photograph of Billoups. The record is not clear how much time passed between Griblin being shown a single photo of Billoups and later being shown a photo lineup. After looking at the single photograph, Griblin picked out an identical photograph of Billoups from a six-person photo lineup. At trial, Griblin stood by his photo lineup identification of Billoups.

3.    *The Wichita Presto Robbery*

About three hours after the Park City Presto robbery, on March 10, 2015, Karen Roguski was opening a Presto gas station in Wichita. Around 6 a.m., a black male

3

wearing tan Carhartt-type work clothing and a brown beanie entered the Presto store. The man asked for cigarettes but then quickly pulled out an object that appeared to be a gun and told Roguski to empty her cash register. The robber made off with approximately $50 and a carton of Newport cigarettes. The robbery was captured by the store's video surveillance system.

A few hours later police circulated a photo on social media of a suspect in another crime (that will be addressed in turn). Roguski saw the photo of the suspect in that crime, and she recognized him to be the man who had robbed the store earlier that same day. She notified the police, and two days later the police showed her a six-person photo lineup that included Billoups. Roguski pointed to Billoups' photo and commented, "I'm thinking it is this one." At trial, Roguski identified Billoups, in person, as the robber.

Following Billoups' arrest, police searched his motel room and found a pink can of mace, brown Dickie's pants, a brown beanie hat, and empty packs of Newport cigarettes.

4.    *The Bank Robbery*

Another three-and-a-half hours after the Wichita Presto robbery, Elizabeth Sprecker was working as a teller at Emprise Bank in Wichita. At approximately 9:40 a.m., a man wearing a yellow hoodie with the hood up, grey athletic leggings underneath yellow gym shorts, and a brown beanie hat walked into the bank lobby. The man approached Sprecker and asked if the bank still cashed McDonald's checks, and Sprecker turned her head toward her computer to begin the transaction. When she turned back to face the man, he was holding a black gun. The man then threw a bag at Sprecker and ordered her to fill the bag with big bills.

Sprecker filled the bag with approximately $10,000 to $12,000, and the man fled toward a getaway car parked at a nearby Jiffy Lube. However, as the robber fled some of

4

the bills fell on the bank floor and in the parking lot; the robber made off with approximately $4,400. Once the man was gone, the police were called. Surveillance cameras also captured this robbery. Sprecker later identified Billoups as the man who robbed the bank from a six-person photo lineup. She again identified Billoups as the robber in court.

Kevin Scranton worked at the nearby Jiffy Lube where the getaway car was parked. Just prior to the bank robbery, the vehicle pulled into the Jiffy Lube, and Scranton approached the vehicle to see if he could be of any assistance. A man wearing a yellow tank top, yellow hoodie, and yellow shorts exited the car and asked to use the restroom. Scranton said yes, and the man walked toward the Jiffy Lube, dropping a cigarette butt as he walked in. After using Jiffy Lube's restroom, the man returned to the car, said something to the passenger, and then walked to the bank. Scranton subsequently saw the man running from the bank back to the vehicle and noticed that he dropped something in transit. When the police arrived at the scene, Scranton pointed them to the cigarette butt the man had previously dropped, which was still smoking. Scranton was sure it was the man's cigarette butt because he had just cleaned up the parking lot, which included cleaning up all the cigarette butts, and because he watched him drop it there. The recovered cigarette butt was a Newport cigarette. DNA testing indicated that Billoups was the one who had smoked the cigarette.

As part of its investigation, the Wichita Police Department released a color photo of the bank robbery suspect to be distributed through local and social media. Two individuals saw the photo and notified police that it was Billoups—his previous postrelease supervision officer (her relation to Billoups was unknown to the jury) and a Cricket Wireless employee who had sold Billoups a cell phone on March 10, 2015. By the end of the day on March 10, the police had Billoups' name and a description of the stolen vehicle he was thought to be driving.

5

5.    *The Car Chase*

On March 11, 2015, two Wichita police officers were on patrol when they spotted the suspect vehicle. As the officers attempted to determine if Billoups was in the car, the vehicle sped off at a high rate of speed. The officers activated their emergency lights and began pursuit of the vehicle. As the officers gained on the vehicle, they noticed there was a female in the front passenger seat. As the car slowed briefly while taking a turn, the passenger, Jamaica Johnson, jumped out of the vehicle. As Johnson rolled on the street, the car ran over her legs, breaking her left tibia. The driver, who was later confirmed to be Billoups, continued driving until one of the officers rammed his patrol car into the stolen car in a parking lot outside of Saint Francis Hospital, which caused Billoups to hit other vehicles. Billoups then fled the car on foot but was ultimately caught and taken into custody by police. Police found a motel key that had fallen out of Billoups' pocket during the foot pursuit. While being attended to, Johnson informed the officers that Billoups was, in fact, the man who robbed Emprise Bank.

6.    *The Trial*

Billoups was ultimately charged with 18 crimes: four counts of aggravated robbery; eight counts of felony theft; and one count each of reckless aggravated battery, aggravated assault, fleeing or attempting to elude law enforcement, criminal possession of a weapon, possession of cocaine, and misdemeanor possession of marijuana. Relevant to this appeal, he was charged with aggravated robbery in connection with the incidents at Subway, both Presto locations, and Emprise Bank; aggravated battery for causing great bodily harm to Johnson during the vehicle chase; and felony theft in connection with the theft of a vehicle. Many of the remaining felony theft charges were for thefts committed at local Dillon's grocery stores.

Immediately prior to trial, Billoups, who was representing himself, pled guilty to seven counts of felony theft, two counts of possession of a controlled substance, one count of aggravated assault, one count of fleeing or attempting to elude a law enforcement officer, and one count of criminal possession of a weapon by a convicted felon.

At trial on the remaining charges, at which Billoups continued to represent himself, the jury convicted Billoups of all four counts of aggravated robbery and one count of aggravated battery. A mistrial was declared on the remaining felony theft charge because the jury was unable to reach a unanimous verdict.

7. *The Sentencing*

Billoups' presentence investigation report (PSI) indicated Billoups' criminal history score was A due to prior convictions of three person felonies.

Prior to sentencing, Billoups challenged his criminal history score on the basis that the State had not proven the factual existence of his prior convictions on his PSI. The State admitted journal entries into evidence regarding the prior convictions, and the district court concluded the State had proven the existence of those prior convictions by a preponderance of the evidence. Accordingly, the district court assessed Billoups' criminal history score as A and imposed a presumptive 484-month prison sentence.

Billoups timely appeals.

ANALYSIS

On appeal, Billoups raises eight arguments which we address in the order he raises them.

I.   WAS THERE SUFFICIENT EVIDENCE TO SUPPORT BILLOUPS' AGGRAVATED BATTERY CONVICTION?

First, Billoups argues there was insufficient evidence to support his aggravated battery conviction for the injury to Johnson when she jumped out of his car during his police chase. Specifically, he argues that although there is evidence of reckless conduct and great bodily harm, there was insufficient evidence to support a finding of a sufficient nexus between his reckless act and Johnson's broken leg because he could not foresee Johnson jumping out of the vehicle. The State responds Billoups' conviction does not require proof that Billoups consciously disregarded the precise manner in which great bodily harm would occur to Johnson and engaging police in a high-speed chase consciously disregards a substantial and unjustifiable risk that a passenger in the vehicle will suffer great bodily harm, which is sufficient to support a conviction of aggravated battery.

When the sufficiency of evidence is challenged in a criminal case, "we 'review[] the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' We will not 'reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *State v. Rucker*, 309 Kan. 1090, 1093, 441 P.3d 1053 (2019). It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018); see *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

Kansas defines reckless aggravated battery, in relevant part, as "recklessly causing great bodily harm to another person or disfigurement of another person." K.S.A. 2014 Supp. 21-5413(b)(2)(A). Within the meaning of Kansas' aggravated battery statute, a person acts "recklessly" when "such person consciously disregards a substantial and

unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2014 Supp. 21-5202(j). The Kansas Supreme Court has held: "To act recklessly, a defendant must know that he or she is putting others in imminent danger." *State v. Gatlin*, 292 Kan. 372, 377, 253 P.3d 357 (2011). "Importantly, one can act recklessly even without foreseeing 'the particular injury that results from his or her conduct.'" *State v. Bolze-Sann*, 302 Kan. 198, 204, 352 P.3d 511 (2015).

Billoups concedes there was ample evidence he acted recklessly by leading police on a high-speed vehicle chase, and he also concedes there was sufficient evidence that Johnson suffered great bodily harm. His only argument is there was not a nexus between his reckless conduct and Johnson's injury because there is no evidence he consciously disregarded the "particular result"—that Johnson would "voluntarily leap from [his] moving vehicle"—and be injured in the process.

In support of this argument, Billoups relies only on *State v. Warnke*, 56 Kan. App. 2d 996, 441 P.3d 1074 (2019). However, *Warnke* does not stand for the proposition that a conviction for reckless aggravated battery requires proof a defendant consciously disregarded the *precise* manner in which the great bodily harm will occur. *Warnke* is unlike the case at hand. In that case, Warnke was driving "on a straight, flat, dry, rural highway with little traffic during daylight hours with unobstructed visibility ahead" when she struck a hay trailer being pulled by a horse-drawn buggy after just completing a cell phone call. 56 Kan. App. 2d at 1012. Warnke was observing the speed limit and was engaged in no unlawful behavior at the time of the incident. The *Warnke* panel held, under the facts of that case, talking on a cell phone just before the crash did not constitute "a gross deviation from the standard of care which a reasonable person would exercise in the situation" and, therefore, Warnke's actions did not support the "conscious disregard" element of K.S.A. 2018 Supp. 21-5202(j). 56 Kan. App. 2d at 1012.

9

In contrast, Billoups clearly broke the law—in fact, he committed numerous traffic infractions—by leading the police on a high-speed chase. Such an action consciously disregards a substantial and unjustifiable risk that a passenger in his car would suffer great bodily harm. Although Billoups argues there was an insufficient nexus between his reckless act and Johnson's broken leg because he could not foresee Johnson jumping out of the vehicle, a defendant need not foresee "'the particular injury that results from his or her conduct.'" *Bolze-Sann*, 302 Kan. at 204. Sufficient evidence supports the jury's finding that Johnson's injury was caused by Billoups when he ran over her leg with his car while engaged in a high-speed chase with the police.

II.     DID THE DISTRICT COURT ABUSE ITS DISCRETION IN REFUSING TO STRIKE CERTAIN TESTIMONY FROM THE RECORD REGARDING AN EYEWITNESS IDENTIFICATION?

Second, Billoups argues the district court abused its discretion by refusing to strike evidence from the record of Griblin's (the Park City Presto employee) identification of him as the man who robbed the gas station. Billoups argues the district court should have instructed the jury to disregard the identification based on an impermissibly suggestive identification procedure. The State's reply is threefold. First, it asserts Billoups invited the error. Second, if error was not invited, the State argues the procedure surrounding Griblin's photo identification of Billoups was not impermissibly suggestive. Third, the State contends that even if the procedure was impermissibly suggestive, any resulting error is harmless.

"Subject to exclusionary rules, an appellate court reviews the grant or denial of a motion to strike concerning the admission or exclusion of evidence for abuse of discretion." *State v. Lloyd*, 299 Kan. 620, 627, 325 P.3d 1122 (2014). The district court abuses its discretion when no reasonable person would take the view adopted by the district court or its decision is based on an error of law or fact. 299 Kan. at 627.

In court, Griblin identified Billoups as the man who maced him and stole cigarettes. As discussed, the State admitted and published surveillance video from the incident, as well as several still photos taken from the video. Griblin testified that within a week of the robbery he identified the robber from a photo array; in fact, it was three days.

On cross-examination, Billoups questioned Griblin about information Griblin had provided Billoups' private investigator. Griblin testified that a couple of days after the robbery, police showed him a single photo of Billoups before showing him the photo array and the same photo individually shown to him matched the one used in the photo lineup.

On redirect, Griblin again identified Billoups as the robber, this time also noting he recognized Billoups' voice from the incident.

Officer Dustin Belton testified he showed Griblin the photo lineup on March 13, 2015—three days after the crime. Belton said he did not show Griblin a single photo of Billoups before presenting the photo lineup, and he had no idea who would have done so.

A recess followed Belton's testimony, and during that recess Billoups argued Griblin's identification should be suppressed and stricken because an impermissibly suggestive procedure during the identification was used. Specifically, Billoups complained of the fact Griblin had been shown the individual photo of himself before being shown the photo lineup. The State responded such a concern goes to the weight of the identification, not the admissibility.

The district court acknowledged there was evidence suggesting the identification procedure was handled improperly and stated it would allow the parties to submit written arguments on the matter as trial proceeded. The district court summarized:

11

"Well, let me just say obviously that is an issue that is for the jury now. There are ways of dealing with it. Motions for directive judgment of acquittal as to certain counts, posttrial motions, can be taken up. I guess the—well, it occurs to me one process that could be considered would be to just declare a mistrial as to that particular count and go on with all the others or, again, as part of the motion for directive judgment of acquittal or as a posttrial motion. Obviously, that process was done improperly. And I'm not going to make a ruling now. All I'm just going to suggest is the information is in front of the jury. There are ways that it can be addressed. I'm not going to declare a mistrial because of that. So we are going to proceed. And then the parties can respectively submit whatever written authorities and legal arguments they wish to make as to the—as to that issue. Obviously I can't tell the jury to disregard it. They can't wipe it from their memory. I'm not going to declare a mistrial. We are going to go on and we will deal with that issue later."

The district court also agreed with the State's argument that the procedure surrounding the identification goes "to the weight and not the admissibility."

After the recess, Officer Duane Schrag, who also assisted with the investigation of the string of robberies, testified he did not show an individual photo to Griblin and he was unaware of any other officer doing so.

At the close of the State's case-in-chief, Billoups moved for a judgment of acquittal based on the photo identification, but the State responded law enforcement had not confirmed Griblin's testimony that he was shown an individual photo of Billoups. Additionally, the State argued that even if the district court viewed the photo lineup procedure as impermissibly suggestive, the evidence was elicited by Billoups based on information uncovered during Billoups' investigator's interview of Griblin, and, therefore, it was known to him before trial. The State stressed the defense did not mention the information gathered from his private investigator surrounding an alleged impermissibly suggestive procedure surrounding the photo lineup before trial.

12

Ultimately, the district court agreed with the State's assessment, stating although there was "an extensive [pretrial] evidentiary hearing" regarding the identification procedures, the defense did not mention the individual photo allegedly shown to Griblin. No further action surrounding Griblin's photo identification occurred at trial.

Before us, Billoups argues the district court abused its discretion because it based its denial of his request to strike Griblin's photo identification from the record on an error of law. Specifically, he argues the district court mistakenly believed it could not strike the evidence at issue.

The State agrees that district courts have the discretion to strike admitted trial evidence. See *State v. Bowen*, 254 Kan. 618, 624, 867 P.2d 1024 (1994). But a review of the record on appeal indicates the district court did not misunderstand its ability to strike evidence from the record; rather, the district court was simply indicating that, from a practical standpoint, it did not believe telling the jurors to disregard the testimony was likely to be effective, noting the jurors could not simply "wipe [the testimony] from their memory." The context of the district court's statement is essential as it stated there were multiple ways of dealing with the matter and invited the parties to submit written arguments before ruling but advised a mistrial would not be granted. This discussion shows the district court was aware of its discretion to determine a proper course of action. We see no legal error here.

Billoups next focuses on whether striking the evidence was warranted based on the facts surrounding the photo identification at issue. Specifically, he argues the procedure used by police was impermissibly suggestive, there was a substantial likelihood of misidentification, and the district court made an error of fact in not striking the evidence from the record.

13

Assuming Griblin's account of the photo lineup procedure is accurate and Griblin was shown Billoups' photo before being presented with the same photo in a lineup, Billoups is not entitled to relief. First, the invited error doctrine precludes our review. It is well established a party may not invite error and then complain of that error on appeal. *State v. Miller*, 293 Kan. 535, 554, 264 P.3d 461 (2011). Here, Billoups' cross-examination of Griblin clearly demonstrated he had learned of the allegedly improper identification procedure in advance of trial. Despite this, Billoups never brought the issue to the district court's attention before trial, even though the admissibility of Griblin's eyewitness identification was litigated as part of a lengthy pretrial hearing. Rather than addressing the admissibility of this identification at that point, Billoups chose to wait until cross-examination of Griblin at trial to attempt to prohibit the admission of the identification. By this point, however, Griblin had already provided an in-court identification of Billoups and testified he identified the suspect in a photo lineup. Billoups made a strategic choice to allow the allegedly improper identification into evidence and then attempted to elicit testimony to discredit that identification. Having made this strategic choice, Billoups cannot now assign error to this action and complain the district court should have stricken the evidence from the record.

Moreover, even if the issue were properly before us, Billoups loses on the merits and is not entitled to a new trial. The United States Supreme Court has emphasized that an improper police influence of an identification does not automatically render the identification inadmissible. *Perry v. New Hampshire*, 565 U.S. 228, 231, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). Exclusion of such an identification need only occur if there is "'a very substantial likelihood of irreparable misidentification'" or when the evidence "'is so extremely unfair that its admission violates fundamental conceptions of justice.'" 565 U.S. at 232, 237 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 [1968], and *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 [1990]). "The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction

of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry*, 565 U.S. at 237.

We follow a two-step approach in determining whether an eyewitness identification should be excluded from admission. *State v. Cruz*, 297 Kan. 1048, 1059, 307 P.3d 199 (2013); *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006). "First, the court determines whether the procedure used for making the identification was impermissibly suggestive. If so, the second step requires an analysis of whether the impermissibly suggestive procedure led to a substantial likelihood of misidentification." 281 Kan. at 304.

Again, assuming Griblin was improperly shown an individual photo of Billoups prior to the lineup, the first step of this test indicates the procedure used by the police here was not sound. "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). The United States Supreme Court has described such a procedure as "undeniably suggestive." See *Perry*, 565 U.S. at 238. Here, being shown one picture of Billoups and then presented with that same picture in a photo lineup is impermissibly suggestive.

However, suppression is not the automatic consequence of an impermissibly suggestive procedure surrounding an identification. See *Perry*, 565 U.S. at 238; *Cruz*, 297 Kan. at 1064. We must consider "'whether there was a substantial likelihood of misidentification under the totality of the circumstances surrounding it.'" *Cruz*, 297 Kan. at 1059. Under this step, we apply the following factors:

"1. The witness' opportunity to view the criminal at the time of the crime;

"2. The witness' degree of attention;

"3. The accuracy of the witness' prior description;

"4. The level of certainty demonstrated by the witness at the confrontation;

"5. The length of time between the crime and the confrontation;

"6. The witness' capacity to observe the event, including his or her mental and physical acuity;

"7. The spontaneity and consistency of the witness' identification and the susceptibility to suggestion; and

"8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly." *Corbett*, 281 Kan. at 304-05; *State v. Trammell*, 278 Kan. 265, 270-71, 92 P.3d 1101 (2004).

See *Cruz*, 297 Kan. at 1064; *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 (2004).

Billoups fails to address any of these factors in his brief and argues only the identification procedure was so coercive that it "all but assured that Mr. Griblin would identify" Billoups as the robber. As Billoups has failed to present any argument concerning these factors, we consider the point abandoned. *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018) (point raised incidentally in brief and not argued therein deemed abandoned).

But even if properly argued, Billoups' argument still lacks merit when we apply the factors found in *Corbett*, 281 Kan. at 304-05.

16

A.     *The witness' opportunity to view the criminal at the time of the crime*

Griblin testified he got a good look at the robber's face in the moments leading up to and during the robbery. He testified he had a conversation with the man and tried to help him purchase cigarettes. At times, Griblin was within one or two feet of the robber, and the lighting in the store was working and allowed Griblin to see what was happening. Griblin saw the robber and interacted with him for approximately three minutes before being maced.

B.     *The witness' degree of attention*

Griblin held a conversation with the robber as he attempted to assist him with a transaction. Such an interaction indicates Griblin was paying attention to the situation before the robbery.

C.     *The accuracy of the witness' prior description*

The surveillance video is consistent with Griblin's statements to law enforcement immediately after the event and his testimony at trial concerning his identification of the robber, what the robber was wearing, and his height.

D.     *The level of certainty demonstrated by the witness at the confrontation*

Griblin took about eight seconds to identify Billoups from the six-person lineup. He stood by this identification at trial.

E.       *The length of time between the crime and the confrontation*

The robbery occurred March 10, 2015. Griblin identified Billoups from the photo lineup on March 13, 2015.

F.       *The witness' capacity to observe the event, including his or her mental and physical acuity*

Griblin did not testify there was anything that would have prevented him from recalling the events, and there is no indication that before being maced Griblin was in a mental state that would have interfered with his ability to remember the events and his attacker.

G.       *The spontaneity and consistency of the witness' identification and the susceptibility to suggestion*

Griblin's description to the police of the robbery and his attacker appear to have remained unchanged at trial.

H.       *The nature of the event being observed and the likelihood the witness would perceive, remember, and relate it correctly*

"This factor requires the court to consider whether the event was ordinary and whether the witness and the criminal were of the same race." *Trammell*, 278 Kan. at 277. The record does not establish Griblin's race, so we cannot determine if the eyewitness and the robber were of the same race. While the transaction began normally, it ended with Griblin being maced, which is far from ordinary, which tilts toward these events being cemented in Griblin's mind. This was not an event Griblin witnessed occurring between two other people as a passerby or inadvertently—these events happened directly to him,

18

which tends to increase the likelihood he would perceive, remember, and relate his identification correctly.

In weighing the factors, there was not a substantial likelihood of misidentification. Therefore, under the facts of this case, the district court did not abuse its discretion in not striking Griblin's identification of Billoups from the photo lineup from the record.

But even if we were to somehow conclude the district court should have suppressed Griblin's pretrial identification of Billoups, reversal of Billoups' aggravated robbery conviction is not necessary. "[A]n in-court identification is capable of standing on its own even though a pretrial confrontation was deficient." *State v. Skelton*, 247 Kan. 34, 43, 795 P.2d 349 (1990). Here, Griblin identified Billoups in court two different times. Griblin specifically pointed to Billoups' voice as an identifying characteristic, and, obviously, Billoups' voice was not a part of the photo lineup procedure. There is no indication Griblin's in-court identifications of Billoups as the robber were tainted by the impermissibly suggestive lineup procedure.

Finally, even if we assume error by the district court by its refusal to strike the photo lineup identification from the record, any error was harmless. "Harmless error occurs when the erroneous admission of evidence could not have affected the result of the trial when considered in light of other evidence that was properly admitted." *Trammell*, 278 Kan. at 281. Here, the jurors were able to view the surveillance video and still photos for themselves and determine whether Billoups was the man who robbed the Park City Presto. The quality of the video and photos were such that, even without identification testimony from Griblin, Billoups' identity as the robber would have been established.

## III. DID THE DISTRICT COURT ERR IN ITS JURY INSTRUCTIONS?

Billoups' next three issues on appeal relate to the district court's failure to give two jury instructions and an incorrect instruction. First, he argues the district court committed clear error by not providing the jury with a cautionary witness identification instruction. Second, Billoups argues the district court committed clear error by not instructing the jury on simple robbery as a lesser included offense of the aggravated robbery charge for the Subway robbery. Third, he argues the district court committed clear error in its definitional jury instruction of "dangerous weapon."

When analyzing jury instruction issues, we follow a three-step process:

"(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

The "first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *Bolze-Sann*, 302 Kan. at 209.

Applying the first step to all three alleged jury instruction errors, there is no dispute Billoups did not request a cautionary witness identification jury instruction and a lesser included simple robbery jury instruction, nor did he object to the district court's jury instruction regarding the definition of "dangerous weapon." "When a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous." *State v. Knox*, 301 Kan. 671, 680, 347 P.3d 656 (2015); see K.S.A. 2019 Supp. 22-3414(3).

When the court applies the second step in determining whether an error occurred, it "consider[s] whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *Williams*, 295 Kan. 506, Syl. ¶ 4.

At the third step, we then assess whether the error requires reversal as "we will only reverse the district court if an error occurred and we are '"firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."' *Knox*, 301 Kan. at 680 (quoting *Williams*, 295 Kan. 506, Syl. ¶ 5)." *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). As the party claiming a clear error, Billoups has the burden to demonstrate the necessary prejudice. See 307 Kan. at 318.

1.     *A cautionary witness identification jury instruction*

Billoups argues the district court should have given a cautionary witness identification jury instruction. The State responds such an instruction is not factually appropriate because there is not a serious question regarding the reliability of the identifications. Moreover, the State claims its case did not rely solely upon eyewitness identification testimony because all three of the incidents in which there had been a positive eyewitness identification—the Park City and Wichita Presto gas station robberies and the Emprise Bank robbery—were captured on surveillance video and those videos, as well as stills from the videos, were presented to the jury.

The Pattern Instruction Kansas (PIK) for eyewitness identifications is as follows:

> "The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he) (she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 4th 51.110 (2018 Supp.).

The Notes on Use accompanying PIK Crim. 4th 51.110 indicate:

"This instruction should be given whenever the trial judge believes there is any serious question about the reliability of eyewitness identification testimony. *State v. Willis*, 240 Kan. 580, 731 P.2d 287 (1987). However, unless there is evidence which causes the trial court to question the reliability of the eyewitness identification, this instruction should not be given. *State v. Harris*, 266 Kan. 270, 278, 970 P.2d 519 (1998)."

The Kansas Supreme Court has held the PIK instruction "contemplate[s] an eyewitness who does not know the defendant personally. Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary. The accuracy of the identification can be sufficiently challenged through cross-examination." *State v. Calvin*, 279 Kan. 193, Syl. ¶ 9, 105 P.3d 710 (2005). Yet,

here, none of the witnesses to the crimes knew the defendant prior to the robberies. The Kansas Supreme Court believes "the best approach is to leave the reliability determination to the jury and allow the parties to challenge the eyewitness identification testimony at trial as the circumstances warrant." *State v. Mitchell*, 294 Kan. 469, 479, 275 P.3d 905 (2012).

First, we must determine if the giving of an eyewitness identification instruction would have been both legally and factually appropriate at Billoups' trial. In *State v. Duong*, 292 Kan. 824, 257 P.3d 309 (2011), the Kansas Supreme Court considered five factors, as set out in *State v. Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001), to determine whether there was a question about the reliability of the eyewitness identification. If there was no question about the reliability of the eyewitness identification, then the eyewitness identification instruction was not legally and factually appropriate and the failure to give the instruction was not clearly erroneous.

The *Saenz* factors used in *Duong* were:

"'(1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.'" 292 Kan. at 836.

We now examine each identification. First, Griblin interacted with the robber at close range in a well-lit area for approximately three minutes before being maced. He testified he got a good look at the robber's uncovered face and heard his voice, both of which contributed to his in-court identification of Billoups. Further, the incident was captured on surveillance video, which gave the jurors the opportunity to see the robber themselves as well as still photos from the robbery. Griblin's account of events and what the robber was wearing matched the surveillance video.

Second, Roguski, the Wichita Presto employee, testified she was able to clearly view the man during their encounter and was able to take mental note of what he was wearing. Just as with the Park City Presto robbery, this robbery was also caught on surveillance video, which the jury was able to view. The jury also viewed still photos taken from the surveillance video. This video and these photos showed the Wichita Presto robber was wearing the same clothing as the man who robbed the Park City Presto hours earlier. Within a few hours of the robbery, Roguski saw the bank robbery photo released by the police, knew it was the man who had just robbed her, and contacted police to let them know. She then later identified the same man in a photo lineup.

Third, Sprecker, the Emprise Bank employee, testified she looked straight at the robber's face and identified Billoups in court as the robber. She explained that although the man entered the bank with his hands partially covering his face, his face was not covered in any way during the robbery itself. Surveillance video and stills from this robbery were also admitted at trial and shown to the jury, and two of these photos provided a close-up view of the robber's face. Billoups' prior postrelease supervision officer and a Cricket Wireless employee also called police to identify Billoups after seeing the photos of the suspect circulated by police on social media.

Here, all three of the identifications are linked together. Starting at the bank robbery, DNA from the cigarette butt identified Billoups as the robber, as well as identifications from Sprecker, Johnson, and two independent tips that police received from members of the public when they saw Billoups' circulated photo. Roguski also saw this photo and recognized the man as the man who had just robbed her hours earlier. This man was wearing the same clothes as the man who robbed Griblin, and Griblin positively identified Billoups. The jury was also given access to the surveillance videos and still photos showing the robber from all three crimes, which provided corroboration of Griblin's, Roguski's, and Sprecker's identifications and allowed the jurors to make their own assessments on the reliability of the identifications. The ability of the jurors to view

24

the crimes in action and make their own assessments as to the reliability of the witness identifications eliminates any serious questions relating to the reliability of the witness identifications. Therefore, a cautionary jury instruction was not legally or factually appropriate. See *State v. Hernandez*, No. 107,750, 2013 WL 5422314, at *3 (Kan. App. 2013) (unpublished opinion) (holding PIK Crim. 4th 51.110 not legally or factually appropriate where jurors had opportunity to view security video from robbery and compare those images to defendant during trial). Here, all three of the eyewitnesses personally interacted with the defendant for several minutes before being robbed. This is not the case where a bystander identifies an individual from an event witnessed from a great distance and did not interact with that individual. Given this level of interaction and ability of the jury to personally access the reliability of the identifications using the surveillance video and stills, PIK Crim. 4th 51.110 was not factually or legally appropriate. Because this instruction was not appropriate, there was no error.

2.      *A simple robbery jury instruction as a lesser included offense for the Subway robbery*

Next, Billoups argues the district court committed clear error by not instructing the jury on simple robbery as a lesser included offense of the Subway aggravated robbery charge because Guzman testified he saw a spring on the handgun brandished by the robber, which caused him to have doubts about whether it was a real handgun or a BB gun. The State responds such an instruction was not factually appropriate.

We will examine whether the omitted instruction was both legally and factually appropriate. See *Williams*, 295 Kan. 506, Syl. ¶ 4. "The inquiry as to whether it would have been legally appropriate to give the instruction is answered by whether the lesser crime is legally an included offense of the charged crime." *State v. Armstrong*, 299 Kan. 405, Syl. ¶ 5, 324 P.3d 1052 (2014). Robbery is defined as "knowingly taking property from the person or presence of another by force or threat of bodily harm to any person."

25

K.S.A. 2014 Supp. 21-5420(a). The offense becomes aggravated robbery when committed by a person who is armed with a dangerous weapon. K.S.A. 2014 Supp. 21-5420(b)(1). A dangerous weapon "is an instrument which, from the manner it is used, is calculated or likely to produce death or serious bodily injury." *State v. Colbert*, 244 Kan. 422, Syl. ¶ 4, 769 P.2d 1168 (1989). Here, robbery is a lesser included offense of aggravated robbery, and the instruction was legally appropriate.

Next, we must determine whether the omitted instruction was factually appropriate. "The inquiry of whether it would have been factually appropriate to give the lesser included offense instruction is governed by the standard stated in K.S.A. 22-3414(3), which requires a determination of whether there is some evidence which would reasonably justify a conviction of the lesser included crime." *Armstrong*, 299 Kan. 405, Syl. ¶ 5.

In *Colbert*, the weapon used was an unloaded and defective handgun, which was inherently incapable of firing. The Kansas Supreme Court held:

"Whether or not a robber is 'armed with a dangerous weapon' for aggravated robbery (K.S.A. 21-3427) purposes is determined from the victim's point of view. An object can be a dangerous weapon if intended by the user to convince the victim that it is a dangerous weapon and the victim reasonably believes it is a dangerous weapon. Hence, an unloaded gun or a gun with a defective firing mechanism may be a dangerous weapon within the purview of the aggravated robbery statute." 244 Kan. 422, Syl. ¶ 3.

The Supreme Court elaborated that a lesser included offense jury instruction was not factually appropriate in that case because

"[c]learly, the robber herein intended the victims to believe the gun was a dangerous or deadly weapon, and the victims reasonably believed it to be such a weapon. As far as the

26

aggravated robbery charges were concerned, the only real issue for the jury was whether or not the defendant was the perpetrator." 244 Kan. at 426.

After Billoups' arrest, the police discovered a BB gun in Billoups' vehicle. At trial during cross-examination by Billoups, Guzman testified:

"BILLOUPS:   Now, you stated that this gun this individual supposedly—the gun this person had, you state that you saw a spring in it?

"GUZMAN:   Yeah.

"BILLOUPS:   So do you know anything about guns?

"GUZMAN:   Not a whole lot.

"BILLOUPS:   But you say you saw a spring like on the top of this gun?

"GUZMAN:   I can't exactly remember where it was, but I remember seeing it somewhere.

"BILLOUPS:   So you knew it was a—I guess it was a BB gun?

"GUZMAN:   I was conflicted. I didn't know for sure. But I had my doubts about the gun."

This testimony is the entire extent of the line of questioning regarding the possibility that Guzman believed Billoups was using a BB gun. When reviewing the record, it is unclear when Guzman stated he saw a spring on the gun; Guzman did not testify to this fact at the preliminary hearing, but possibly he told this information to Billoups' private investigator.

Guzman's testimony indicates Billoups intended Guzman to believe the gun was a dangerous weapon, as he pointed it at Guzman while demanding money. Also, Guzman testified he complied with Billoups' requests because he did not want to get hurt over another person's money. See *State v. Moore*, 269 Kan. 27, 33, 4 P.3d 1141 (2000) ("A reasonable person would not ordinarily surrender his or her car to a stranger under such circumstances unless he or she feels threatened or intimidated."); *State v. Dilliehunt*, No. 95,679, 2008 WL 440493, at *1-2 (Kan. App. 2018) (unpublished opinion) ("[A]

27

reasonable clerk at a convenience store would not surrender merchandise without feeling threatened or intimidated. Convenience store robberies are also not uncommon. The store clerks' surrender of the cigarettes in these cases was no more of a voluntary act than was the victim's surrender of her car keys in *Moore*.").

Further, even if Guzman believed the gun was a BB gun, the Kansas Supreme Court has held that a BB gun, even if is it unloaded, is a "dangerous weapon" under the meaning of K.S.A. 2014 Supp. 21-5420(b)(1) because "[t]he pistol is heavy and could easily have been used as a bludgeon against the victims, rendering serious injury or even death." *State v. Prince*, 227 Kan. 137, 141, 605 P.2d 563 (1980); see *State v. Davis*, 227 Kan. 174, 177, 605 P.2d 572 (1980) (holding starter pistol, incapable of firing projectile because barrel was blocked, elevated robbery to aggravated robbery because defendant clearly intended store attendant to believe gun was operable and dangerous and could have been used as bludgeon); *State v. Childers*, 16 Kan. App. 2d 605, 612, 830 P.2d 50 (1991) ("[A] toy water pistol can be found to be a dangerous weapon if the user intended the victim to believe it was a dangerous weapon and the victim reasonably believed it was a dangerous weapon."), *rev. denied* 250 Kan. 806 (1992); *State v. Johnson*, 8 Kan. App. 2d 368, 369, 657 P.2d 1139 ("[L]oaded and operable [air rifle] gave the impression it was deadly."), *rev. denied* 233 Kan. 1093 (1983). Therefore, the weapon used in this case, if it was in fact the BB gun discovered after Billoups' arrest, was a dangerous weapon sufficient to elevate simple robbery to aggravated robbery. When the use of a dangerous weapon is undisputed, as is the case here, "an instruction on simple robbery was not required." *State v. Shoemake*, 228 Kan. 572, 575-56, 618 P.2d 1201 (1980).

Moreover, in assessing whether the instruction was warranted, the theory of defense must also be considered. In *State v. Mitchell*, 234 Kan. 185, 189-90, 672 P.2d 1 (1983), the Kansas Supreme Court held the trial court properly failed to give a lesser included instruction on simple robbery because:

28

"It is not contested in this case that the robber had a gun. Every witness who was in the bar at the time of the robbery testified that the robber had a gun. This is not a case where the defendant admitted the crime but claimed not to have used a weapon. The question the jury was asked to decide was whether appellant was the robber, not whether a weapon was used. As this court noted in a similar case, the appellant was guilty of aggravated robbery or nothing."

This is similar to the theory of defense in the case at hand. While Billoups briefly questioned Guzman about the type of gun he thought the robber had, Billoups' cross-examination of Guzman was focused on emphasizing Guzman could not see the robber's face and thus could not identify Billoups as the perpetrator. Additionally, Billoups exclusively focused on the identification issue in his closing argument, without mention of whether a BB gun or a handgun was used to facilitate the robbery of the Subway. This theory of defense further eliminated the need for the instruction. As in *Mitchell*, under Billoups' theory, he was either guilty of aggravated robbery or nothing at all. In fact, Billoups states in another section of his brief that the central question at trial "was whether Mr. Billoups was the person who committed [the] robberies."

Under the specific facts of this case, the lesser included offense instruction on simple robbery was not factually appropriate.

3. *The definitional jury instruction for "dangerous weapon"*

Next, Billoups argues the instruction the district court gave the jury on the definition of "dangerous weapon" in aggravated robbery was improper because, although it followed Kansas Supreme Court precedent, that precedent was wrongly decided.

Applying the second step of the jury instruction analysis, it is clear there was no error in the definitional "dangerous weapon" jury instruction. Billoups was charged with aggravated robbery under K.S.A. 2014 Supp. 21-5420(b)(1), meaning robbery committed

29

while armed with a dangerous weapon. The district court provided the following jury instruction on the definition of "dangerous weapon":

> "[A] 'dangerous weapon' is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury. An object can be a dangerous weapon if the user intended to convince a person that it is a dangerous weapon and that person reasonably believed it to be a dangerous weapon."

Billoups argues this definition departed from the plain language of K.S.A. 2014 Supp. 21-5420(b)(1) because "it permitted for an aggravated robbery conviction based upon a victim's subjective appraisal of danger, rather than the objective reality of [the] offender's actual possession of a dangerous weapon." However, Billoups acknowledges this definition is in accordance with existing Kansas Supreme Court precedent, as was discussed above. See *Colbert*, 244 Kan. at 425-26; see also *State v. Holbrook*, 261 Kan. 635, 640, 932 P.2d 958 (1997) ("Where it is charged that an aggravated robbery was committed by threat of bodily harm to the victim while the robber was armed with a dangerous weapon, it is not necessary for the State to prove the robber actually exhibited the weapon to the victim. Whether the robber was armed with a dangerous weapon is to be determined from the victim's reasonable point of view. The robber's conduct and/or statements, if intended to convince the victim that the robber is so armed, along with a reasonable indication by the victim that he or she was so convinced, may be legally sufficient to satisfy this element.").

Billoups concedes we are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). He raises the argument for the purpose of obtaining review by the Kansas Supreme Court. However, as we see no indication from the Kansas Supreme Court that it intends to

30

depart from its previous rulings, we are compelled to hold the district court did not err in its instruction regarding the definition of "dangerous weapon."

In summary, there was no error in the instructions provided to the jury by the district court.

## IV. DID CUMULATIVE ERROR DEPRIVE BILLOUPS OF A FAIR TRIAL?

Next, Billoups argues cumulative error deprived him of a fair trial. Specifically, he argues the witness identification errors were not harmless and the jurors likely would have reached a different verdict on the aggravated robbery charges that were supported by eyewitness identification testimony. But we will find no cumulative error when the record fails to support the errors a defendant raises on appeal. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). Because we have found no trial errors, there cannot be cumulative error.

## V. DID THE DISTRICT COURT ERR IN CLASSIFYING BILLOUPS' PRIOR OUT-OF-STATE CONVICTION AS A PERSON FELONY?

For the first time on appeal, Billoups argues the district court erred in classifying one of his prior out-of-state convictions as a person felony. Specifically, he argues his prior California robbery conviction was improperly classified as a person offense because the elements of California robbery are broader than the elements of the comparable Kansas crime. The State concedes this argument.

Classification of prior offenses for criminal history purposes involves statutory interpretation, which is a question of law subject to unlimited review. *State v. Wetrich*, 307 Kan. 552, 555, 412 P.3d 984 (2018).

Although Billoups did raise a challenge to his criminal history before the district court, he did not challenge it on these precise grounds. Typically, we will not consider issues raised for the first time on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). However, under K.S.A. 2019 Supp. 22-3504(a), an illegal sentence may be corrected at any time, including when the issue is raised for the first time on appeal. See *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015) (*Dickey I*).

Billoups' PSI assigned him a criminal history score of A based on three prior person felonies, one of which was a 1991 California robbery conviction for second-degree robbery. Had this conviction been scored as a nonperson felony, Billoups' criminal history score would have been B, which would reduce his presumptive sentence. See K.S.A. 2018 Supp. 21-6804.

We follow a two-step process when classifying prior out-of-state convictions for the purposes of criminal history. First, the prior offense is classified as either a felony or a misdemeanor according to how the convicting jurisdiction classified the offense. K.S.A. 2018 Supp. 21-6811(e)(2). Billoups does not challenge the prior conviction's classification as a felony. Second, the offense is classified as either a person or nonperson crime by referring to "comparable offenses under the Kansas criminal code in effect on the date the current crime of conviction was committed." K.S.A. 2018 Supp. 21-6811(e)(3).

At the time of Billoups' sentencing on August 24, 2018, the definition of "comparable" was provided by caselaw. See *Wetrich*, 307 Kan. at 559-60, 562. But see K.S.A. 2019 Supp. 21-6811(e)(3)(B)(i) (mandating out-of-state convictions stemming from specific enumerated circumstances classified as person offenses). Under *Wetrich*, 307 Kan. at 562, which was decided on March 9, 2018, for an out-of-state conviction to be classified as a person offense, that offense must have elements identical to or narrower than the Kansas person crime. The State concedes *Wetrich* controls the definition of

"comparable" for this case. See *State v. Murdock*, 309 Kan. 585, 591-92, 439 P.3d 307 (2019) (*Murdock II*) (holding legality of sentence controlled by law in effect at time sentence pronounced).

Using *Wetrich*'s "identical to or narrower than" approach, we note Billoups was convicted of second-degree robbery in 1991 under Cal. Penal Code § 211 (1988), which defined robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Robbery in the second degree was defined as any other type of robbery not listed in Cal. Penal Code § 212.5(a). Cal. Penal Code § 212.5(b) (1988). As it is not contested that Billoups was convicted of second-degree robbery, it is unnecessary to list the elements of first-degree robbery.

The California Legislature defines "fear" as used in § 211 as:

> "1. The fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family; or,

> "2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." Cal. Penal Code § 212 (1963).

At the time Billoups committed his current crimes, Kansas defined robbery as "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 2014 Supp. 21-5420(a).

California's definition of robbery is significantly broader than Kansas' definition of robbery. For example, under California's definition, a defendant could be convicted of robbery by threatening to damage a person's property. In contrast, Kansas' definition of robbery requires taking property by force or threat of bodily harm to a person; it does not

33

include a threat to another person's property. Thus, the California robbery statute is broader than the Kansas robbery statute and cannot be used as a comparable offense under K.S.A. 2018 Supp. 21-6811(e)(3). Because it is not a comparable offense, Billoups' California robbery conviction cannot be considered a person felony when calculating his criminal history score. See K.S.A. 2018 Supp. 21-6811(e)(3) (mandating "[i]f the state of Kansas does not have a comparable offense in effect on the date the current crime of conviction was committed, the out-of-state crime shall be classified as a nonperson crime"); *State v. Barnes*, No. 119,582, 2019 WL 3518899, at *3 (Kan. App. 2019) (unpublished opinion) (applying *Wetrich* and finding California robbery broader than Kansas robbery), *rev. denied* 310 Kan. ___ (December 17, 2019); *State v. Lacey*, No. 118,902, 2018 WL 6425682, at *2-3 (Kan. App. 2018) (unpublished opinion) (same), *rev. denied* 310 Kan. ___ (September 11, 2019).

Therefore, we vacate Billoups' sentence and remand this case for resentencing.

VI.     DOES THE KANSAS SENTENCING GUIDELINES ACT VIOLATE § 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS?

Finally, Billoups argues he received an improper sentence because the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2019 Supp. 21-6801 et seq., violates the state common-law right to a jury trial, preserved in § 5 of the Kansas Constitution Bill of Rights, by allowing judicial findings of a defendant's prior convictions to elevate the punishment for a current conviction. Specifically, he argues penalty-enhancing judicial fact-finding of any kind does not square with the right to a jury trial which existed at common law prior to Kansas' statehood. Thus, the KSGA sentencing scheme which dictated his sentence violated § 5 of the Kansas Constitution Bill of Rights. Billoups properly gave notice to the Kansas Attorney General that he was challenging the constitutionality of a statute before us. See Kansas Supreme Court Rule 11.01 (2020 Kan. S. Ct. R. 69). The Attorney General elected not to respond.

34

Billoups received a presumptive KSGA sentence. K.S.A. 2019 Supp. 21-6820(c)(1) prohibits an appellate court from reviewing the propriety of a presumptive KSGA sentence. But here, Billoups asserts that the KSGA *itself* is unconstitutional. When an appellant challenges the constitutionality of the KSGA, an appellate court may first consider the constitutionality of the challenged provision before determining if it has jurisdiction to review the disputed sentence. See *State v. Johnson*, 286 Kan. 824, 842, 190 P.3d 207 (2008).

Billoups did not raise this issue before the district court. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including:

> "(1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason." *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Billoups acknowledges he did not challenge the constitutionality of the KSGA before the district court, but he contends now (1) the KSGA is facially unconstitutional and involves a purely legal question that may be raised for the first time on appeal; and (2) review of this issue is necessary to guard against infringements to the basic and fundamental right to a jury trial protected by § 5 of the Kansas Constitution Bill of Rights.

The State contends Billoups fails to meet any exception that would allow his constitutional challenge to be heard for the first time on appeal. Specifically, the State argues the first exception would not apply because although Billoups' argument involves

a purely legal question, determination of the constitutionality of the KSGA would not be determinative of his case since the relief could be to present his criminal history to a jury upon remand rather than to vacate his sentence. The State also argues Billoups' reliance on the second exception is misplaced because of his failure to challenge his criminal history score before or at the time of sentencing. Yet, these assertions miss the mark because Billoups' claim involves both a purely legal question and a fundamental right. The right to a jury trial is a fundamental right and is enumerated in both the United States Constitution and the Kansas Constitution. See U.S. Const. amend. VI; Kan. Const. Bill of Rights, § 5. Thus, we may consider his claim for the first time on appeal. See *State v. Beaman*, 295 Kan. 853, 857-58, 286 P.3d 876 (2012).

Construction of the KSGA and determination of the constitutionality of its provisions are questions of law subject to unlimited review. *State v. Davis*, 275 Kan. 107, 124, 61 P.3d 701 (2003).

The constitutionality of judicial fact-finding of a criminal defendant's prior convictions under statutory sentencing schemes like the KSGA is well established. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Billoups concedes the United States Supreme Court has never extended *Apprendi* to include judicial fact-finding of a defendant's prior convictions. Similarly, the Kansas Supreme Court has repeatedly rejected the argument the KSGA violates the Sixth and Fourteenth Amendments to the United States Constitution. See, e.g., *State v. Watkins*, 306 Kan. 1093, 1094, 401 P.3d 607 (2017); *State v. Johnson*, 304 Kan. 924, 956, 376 P.3d 70 (2016); *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002).

Nonetheless, Billoups maintains the KSGA violates his constitutional right to a jury trial as preserved by the Kansas Constitution. Relying on Justice Thomas' concurring opinion in *Apprendi*, Billoups argues § 5 of the Kansas Constitution Bill of Rights (which states "[t]he right of trial by jury shall be inviolate"), unlike the Sixth Amendment to the United States Constitution (which guarantees "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"), preserved a common-law right to a jury trial on penalty-enhancing prior conviction findings.

The State responds by arguing the Kansas Supreme Court rejected an argument in *State v. Conley*, 270 Kan. 18, 35, 11 P.3d 1147 (2000), that § 5 of the Kansas Constitution Bill of Rights is more inclusive than the Sixth Amendment to the United States Constitution. Although *Conley* has been overruled on other grounds, the Kansas Supreme Court's rejection of the argument that § 5 is broader than the Sixth Amendment remains good law. See *State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014).

Billoups' Kansas constitutional challenge to the KSGA must fail because he provides no authority showing the Kansas Supreme Court interprets the Kansas provision providing a right to a jury trial to be more inclusive than the equivalent federal constitutional amendment. Instead, our Supreme Court treats the jury trial right under the Kansas Constitution identically to the United States Supreme Court's interpretation of the Sixth Amendment to the United States Constitution. See *State v. Carr*, 300 Kan. 1, 56, 331 P.3d 544 (2014) ("We have not previously analyzed our state constitutional language differently from the federal provision."), *rev'd and remanded on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013) ("[A]t least for the past half-century, this court has generally adopted the United States Supreme Court's interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution."). Again, we are duty bound to follow Kansas Supreme Court precedent unless there is some indication it is departing from its previous position. See *Rodriguez*, 305 Kan. at 1144.

Because Billoups concedes that both the United States Supreme Court and the Kansas Supreme Court have consistently held judicial fact-finding of a criminal defendant's prior convictions is constitutionally permissible under the Sixth Amendment, he is not entitled to relief on his constitutional challenge that the KSGA violates the Kansas Constitution. See *Apprendi*, 530 U.S. at 490; *Watkins*, 306 Kan. at 1094; *Ivory*, 273 Kan. at 45-48. As a result, we conclude Billoups had no state constitutional right to a jury trial on the determination of his prior convictions because his sentence fell in the presumptive range allowed under the KSGA.

Our conclusion is consistent with the decision on the identical issue from another panel of our court. In *State v. Valentine*, No. 119,164, 2019 WL 2306626, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. ___ (December 17, 2019), the panel held:

"In view of the Kansas Supreme Court's consistent rejection of the Sixth Amendment-based version of Valentine's current argument, it is incumbent on Valentine to provide authority showing our Supreme Court interprets—or would interpret—§ 5 of the Kansas Constitution Bill of Rights to require jury findings that the Sixth Amendment does not. He fails to do so. 'This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position.' Valentine's argument fails. [Citation omitted.]"

Although we are not bound by this decision, and Billoups argues that *Valentine* was improperly decided, Billoups presents no convincing authority that the panel's reasoning in *Valentine* is flawed. See *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 13, 287 P.3d 287 (2012) ("[P]anels of the Kansas Court of Appeals are not bound by prior rulings of another panel.").

Because Billoups received a presumptive sentence, we lack jurisdiction under K.S.A. 2019 Supp. 21-6820(c)(1) to consider Billoups' challenge to it and, accordingly, dismiss that portion of his appeal.

Billoups' convictions are affirmed, his sentence is vacated, and the case is remanded for resentencing consistent with this opinion. Billoups' other challenge to his sentence is dismissed.

Affirmed in part, dismissed in part, sentence vacated, and case remanded with directions.